IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-10996
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

RONALD W. HUGHES, SR.,

Defendant-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Texas, Dallas

_____
October 30, 2000
Before JOLLY, HIGGINBOTHAM, and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The government appeals the district court's grant of a motion under 28 U.S.C. § 2255, which vacated the conviction of Ronald Hughes, Sr. Initially, the magistrate judge heard the evidence and recommended that the motion be granted, concluding that Hughes was entitled to a new trial because the government had suppressed materially exculpatory information in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194 (1963). After an evidentiary hearing, the district court adopted the magistrate judge's report, and released Hughes from custody.

Because we find that the evidence that the government failed to turn over to the defense was not material, we reverse the district court and reinstate the conviction and sentence.

I

A

Ronald Hughes, Sr., an experienced businessman, was convicted on several counts of an indictment charging conspiracy and money laundering. In summary, Hughes accepted large sums of cash from a Betty Allen as a loan to expand his funeral home business. Harry Pierce, a friend and former employee of Hughes, introduced Hughes and Allen when Allen mentioned she had money to invest. Purportedly, Allen told Hughes that the money was hers, a bequest from a rich deceased oilman--Joe Brown--which had been given to her because she had been his mistress. Joe Brown was a real person, and it is apparently true that Brown distrusted banks, and kept his money in cash.

Hughes received the first $1 million loan, mostly in small bills, on June 27, 1989. Hughes was acquitted of money laundering for this transaction. On July 1, 1989, Hughes signed a promissory note for the cash, and, on his lawyer's advice, received an affidavit from Allen that the money was "clean." Named as payees on the note were Allen and a Robert Chambers. Allen insisted on including Chambers, who she allegedly claimed was another Brown

beneficiary and shared ownership of the money. In fact, as Allen told Pierce initially, the money belonged solely to Chambers. Chambers earned the money in $1 million increments for each ton of cocaine he helped to smuggle into the United States and had given it to Allen for safekeeping. Apparently, the loan was wholly Allen's idea, which Chambers only discovered after the fact.

On July 20, 1989, Pierce called Hughes and told him that Betty Allen had phoned from Arizona and had asked Pierce to meet her in Scottsdale and fly back with her to Dallas. Because Pierce was unable to accompany her, he asked Hughes to go in his place. The next day, Hughes flew to Phoenix on a chartered jet, for which he paid a fee of over $4000. Hughes met Allen, who had spent the night at Chambers's girlfriend's house, and together they drove to a storage facility to retrieve another $2 million. When they arrived at the mini-warehouse, Allen opened a storage room that contained a safe holding a large sum of currency in small bills. As Hughes testified at trial, Allen told him that Chambers had put the money in the safe. He also testified that it "crossed his mind" that the money was "possibly drug money." Upon return from Phoenix, Hughes put the cash in the trunk of his car and delivered the money, pursuant to Allen's instruction, to Pierce's apartment. Hughes was convicted of money laundering for this transaction.

Hughes received another $1.9 million around August 1, 1989. The money that formed the basis of this second loan was loaded into trunks and bags and flown into the Dallas airport on Allen's airplane. Hughes met Allen, Pierce and Allen's daughter at the airport and took the money, again, all of it in cash. Hughes paid Pierce $50,000 for flying to Alpine, Texas, to help pick up the money. Hughes was also convicted of money laundering for this transaction.

On August 8, 1989, Chambers came to Dallas to meet with Hughes. Although the contents of the meeting are contested, it is undisputed that Chambers indicated that the money was his, that he told Hughes that he had once worked for a man named Pablo Acosta, that he had inherited Acosta's turf, and that Acosta was like a godfather to him. Hughes told Chambers that he had checked Chambers out through a long-time friend at the FBI.

Beginning in July 1989, Hughes and his family members and employees made 199 deposits in amounts less than $10,000 in bank accounts at eleven different banks throughout Dallas and the surrounding area to avoid filing Currency Transaction Reports. Hughes instructed the company's comptroller to characterize the money as loans from Hughes to the company. The loans were repaid within a day or two in the form of checks from the business to Hughes. When the company's comptroller inquired about the infusion

4

of cash, Hughes lied to her, saying that he had gotten a loan from a bank.

Hughes's defense at trial was that he did not know the money was drug proceeds. Instead, he testified that he believed Allen's story about her rich benefactor. He also said that his structured deposits were a means to avoid an IRS audit, not other law enforcement authorities. Chambers was the government's primary witness at trial. On the witness stand, Chambers testified in effect that Hughes most likely knew that the money was not from Joe Brown and that he, Chambers, had concocted the Joe Brown story after all of the transactions were completed.

The jury acquitted Hughes of all structuring charges and of the money laundering count that charged his receipt of the first $1 million. He was convicted of conspiracy and of money laundering for the transaction related to the Phoenix trip, the transaction in early August, and for buying property and a certificate of deposit with the funds in September and November, respectively.

There are two Brady statements at issue. The first, which relates to Chambers's testimony for the government, is the FBI interview given by Agent Charles Holmes, an IRS agent investigating the Hughes matter, which was taken by FBI Agent Stephen Largent, investigating a related matter. (This is referred to as the 302 interview). The portion of that interview at issue is as follows:

> Holmes stated that Glenn Chambers was busted with one ton of cocaine and pled guilty to the charges agreeing to cooperate. Chambers has told Holmes that the Hughes family knew that the money they received was drug money about six weeks after receiving the money. He stated that Betty Allen knew from day one that the money was drug money, but that all evidence supports the fact that Betty Allen initially told Ronald Hughes, Sr. that the money came from her former lover, Joe Brown.

Hughes claims this statement contradicts Chambers's trial testimony that he, Chambers, fabricated the Joe Brown story after Allen gave Hughes the money.

The second Brady statement was an oral comment made by Holmes to Customs Agent Dan Dobbs, in which Dobbs related that Holmes stated that he had an undefined problem with the Hughes family and would do all that he could to "get" them.

                                    B

After we affirmed his conviction on direct appeal in an unpublished opinion, Hughes filed his § 2255 petition alleging the aforementioned Brady violations. The matter was referred to a magistrate judge for development. The magistrate judge held a one-day evidentiary hearing. In a written opinion, she recommended that the § 2255 petition be granted. She concluded that Holmes's 302 statement was material under Brady, principally because it undercut Robert Chambers's trial testimony that he was the source of the "it was Joe Brown's money" story, and that he had not concocted that cover until after Hughes had accepted the money from

6

Allen. She also considered whether Hughes would have been convicted based on other circumstantial evidence of knowledge, but found that the Brady violation sufficiently undermined confidence in the jury verdict to vacate the conviction. The magistrate judge also found that the prosecution's failure to disclose Holmes's statement about a Hughes family vendetta was a Brady violation because, taken together with the 302 statement, it called into doubt the credibility of his investigation.

The district court, over Hughes's objection, held its own evidentiary hearing after receiving the magistrate judge's recommendation. Without stating its reasons in writing, the district court affirmed the magistrate judge's recommendation and vacated Hughes's sentence.

II

We review Brady claims *de novo*. See Felder v. Johnson, 180 F.3d 206, 212 (5th Cir. 1999); United States v. Green, 46 F.3d 461, 464 (5th Cir. 1995). Factual findings are reviewed for clear error. See United States v. Placente, 81 F.3d 555 (5th Cir. 1996).

We start with the premise that the prosecution has a duty to turn over impeachment evidence favorable to an accused when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct.

7

3375, 3383 (1985). There are three components to a <u>Brady</u> violation. First, the evidence must be favorable to the accused, a standard that includes impeachment evidence. Second, the State must have suppressed the evidence. Third, the defendant must have been prejudiced. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948 (1999). It is this final component--the materiality component--that is most at issue in this appeal.

The materiality inquiry turns on the question of whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles v. Whitley</u>, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566 (1995). The defendant has the burden to establish a reasonable probability that the evidence would have changed the result. <u>Strickler</u>, 527 U.S. at 291. When there is more than one <u>Brady</u> violation, we must consider the cumulative effect of the suppressed evidence. <u>Kyles</u>, 514 U.S. at 421-22; <u>United States v. Freeman</u>, 164 F.3d 243, 248 (5th Cir. 1999). Because we find that Hughes did not establish a reasonable probability that the evidence would have produced a different result, we do not need to consider whether Hughes established the other Brady components.

III

A

We turn now to the materiality of the statement from the FBI 302 interview summary of Holmes. Money laundering under 18 U.S.C. §§ 1956 and 1957 requires a showing that the defendant knew at the time of the transaction in question that it involved the proceeds of an unlawful activity.

Hughes argues that Chambers's testimony was the only support for the conclusion that Hughes knew of the illegal nature of the money. Hughes, as we have mentioned, testified that at the time he accepted the money for which he was convicted, he believed Allen's story that it was a gift to her and Chambers from Joe Brown. Chambers, however, testified on the witness stand that he concocted the Joe Brown story after Hughes had received the three cash transfers, and that there was "no doubt" in his mind that Hughes knew the money was illegal. Thus, because Holmes's statement in the 302 FBI interview might have impeached Chambers as to when Hughes learned that the money was illicit, the magistrate judge concluded that the statement was material for the purpose of Brady.

The question of materiality, however, is, as we have noted, whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 434. Thus, we need to

9

consider whether this potentially impeaching evidence would have created a "reasonable possibility" of a different result.

It is important to note that two of the money laundering transactions for which Chambers was convicted, one in September and one in November of 1989, fall outside the scope of the 302 interview statement. The statement specifically acknowledges that Chambers claimed that the Hughes family knew the money they received was drug money about six weeks after receiving the money. Hughes was convicted of money laundering for two transactions that occurred *after* the six-week point. Thus, for the transactions in September and November, the statement supports the government's position that Hughes was aware of the illegal nature of the money at the time of the transaction.[1] For these two transactions, it is

---

[1] Neither the government nor the magistrate judge remarked on the fact that the statement would have had no effect on Hughes's convictions for money laundering in the September and November transactions. The magistrate judge noted that a key issue at trial for both the money laundering and conspiracy counts was whether Hughes knew *at the time of the three money transfers* that the money was derived from drug trafficking. This was relevant to the money laundering charges in September and November because if Hughes knew that the money was derived from illicit sources in July, he clearly knew that the money was derived from illicit sources in September and November. Evidence that tends to corroborate the claim that Hughes knew that the money was derived from illicit sources in August (six weeks after the first transaction), however, aids the government in showing that Hughes knew in September and November that the money was derived from illegal sources.
  Hughes was sentenced on September 20, 1995, to a term of 60 months for the conspiracy conviction, a term of 165 months each for the two money laundering convictions that occurred before the

obvious that disclosure of the statement would not have led to a different result. The question concerning the statement's materiality therefore only pertains to the money laundering convictions for the July and August 1989 transactions.

The statement itself is somewhat ambiguous. The government argues that the sentence, "Chambers has told Holmes that the Hughes family knew that the money they received was drug money about six weeks after receiving the money," does not specifically contradict the theory that Hughes, Sr. knew that the money was illegal prior to the six week point. The government contends that the next sentence, "[h]e stated that Betty Allen knew from day one that the money was drug money, but that all evidence supports the fact that Betty Allen initially told Ronald Hughes, Sr., that the money came from her former lover, Joe Brown," was really about what Holmes believed, not what Chambers believed. Although these contentions are debatable, they demonstrate that the jury would have had to

--------

August 8 meeting with Chambers, and a term of 120 months for each of the two money laundering transactions in September and November. The sentences are running concurrently. Thus, even if the Brady statement had proved to be material for the transactions in July and August of 1989, Hughes should not have been released, because the statement was clearly not material to the money laundering convictions for the transactions in September and November. At most, the statement would have allowed the magistrate judge and the district court to vacate the 165-month sentences. It would not have allowed the magistrate judge and the district court to vacate the 120-month sentences.

11

grapple with the meaning of the statements before determining whether they impeached Chambers's testimony.

Chambers seems to have been an important government witness, but his credibility did not go untested. He was impeached at trial on various grounds. He admitted that he had lied on multiple occasions, including under oath, that he was testifying to have his sentence reduced, and that he had used drugs in the past. Three other witnesses--Hughes's lawyer, his accountant, and a government witness--all testified that Hughes told them the Joe Brown story before Chambers claimed to have made it up. Furthermore, the jury acquitted Hughes of money laundering charges for the first $1 million transaction. This acquittal indicates that the jury did not find Chambers's testimony that he had made up the Joe Brown story after Hughes had received the money credible enough to infer that Hughes knew that the money he received initially was from illicit sources.

Not only is it unclear that the statement would have had a significant effect on the impeachment of Chambers, Chambers's statement was not the only evidence concerning Hughes's state of mind at the time he received the money. A significant amount of circumstantial evidence clearly indicated that Hughes must have been aware that the money came from illegal sources. The jury convicted Hughes of money laundering for transactions that occurred

12

after Hughes had signed the promissory note that included the name Robert Chambers, after Hughes began lying to his employees about the source of the money, after he began making the 199 different deposits under $10,000, and after his bizarre trip to Phoenix with Betty Allen.  Hughes even admitted at trial that during the trip to Phoenix it "crossed his mind" that the money was "possibly drug money."  Furthermore, the jury was at liberty to apply its common sense and find that any business man with Hughes's background would have  known that a "loan" under these circumstances was fraught with illegal probabilities.  The jury could easily have determined that Hughes's criminal intent was exemplified by his surreptitious conduct and his continued participation in this highly irregular, if not outlandish, plot.

Chambers testified at trial that he had "no doubt" that Hughes knew the money was illegal. As defense counsel pointed out at trial, however, Chambers did not know what Betty Allen told Hughes about the money at the time she gave it to him.  When discussing his first meeting with Hughes, Chambers testified that although he did not say that he smuggled drugs, "I doubt very seriously that you could have had a doubt about that money."  This testimony suggests that Chambers's opinion about Hughes's knowledge came from the circumstances surrounding the transfer and handling of the money.  Given the fact that Chambers was aware that Hughes accepted

millions of dollars in small bills from Allen in bags, and retrieved cash from storage facilities, this opinion is not surprising.

The ambiguity of the statement, the impeachment of Chambers that occurred at trial and the other evidence demonstrating Hughes's knowledge beyond a reasonable doubt convince us that the 302 interview that the government failed to turn over to Hughes was not material for the purpose of Brady. Evaluating Chamber's testimony and the other evidence in context, we simply cannot conclude that the undisclosed evidence puts the "whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435. Or stated in a different way, based on the record of Hughes's criminal trial, we have complete confidence in the jury verdict of guilty even when considered in the light of this Brady statement.

B

The other Brady statement at issue concerns potential bias by the IRS agent investigating the matter, the same Charles Holmes to whom we have earlier alluded. The statement at issue was made by Customs Agent Dan Dobbs during the course of an investigation of an FBI agent who may have acted improperly because of his friendship with the Hughes family. The statement is as follows:

> Agent Holmes told U.S. Customs Special Agent Daniel Dobbs that he, Agent Holmes, had a problem with Ronald Hughes,

14

> Jr. either during high school or college, that Holmes
> would do everything he could to harass and annoy the
> Hughes family, and that Holmes would get members of the
> Hughes family.

The magistrate judge found that although Holmes's 302 statement merited vacating the conviction standing alone, Dobbs's statement buttressed that conclusion. Although the magistrate judge found that Holmes's allegations of previous problems with the Hughes family were probably untrue, she still found them exculpatory and found that they called into question the integrity of the government's investigation.

This statement, however, even in conjunction with the 302 interview, does not create a reasonable probability that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, 514 U.S. at 435. The magistrate judge noted that, as it related to Hughes's conviction, this statement was not important evidence. Although the magistrate judge eventually found that Dobbs maintained throughout questioning that Holmes had made such a statement, Dobbs admittedly waffled--and waffled--as to whether Holmes had actually made the reported statement.

Even if the statement did prove that Holmes was biased against Hughes, Holmes was not a government witness, and every fact leading to Hughes's conviction occurred before Holmes undertook his investigation. There is no evidence that Holmes "framed" Hughes or

15

improperly influenced any of the witnesses. In fact, it is not clear how evidence of his bias could have  influenced the result at trial.   In short, this dubious evidence of potential bias adds nothing to  Hughes's defense.   Because Hughes has not shown that this statement, even in conjunction with Holmes's 302 interview, would have undermined confidence in the trial, Dobbs's statement is not material for the purpose of <u>Brady</u>.

## IV

Because we find that the statements the government failed to turn over to Hughes were not material under <u>Brady</u>, either separately or cumulatively, we REVERSE the district court's grant of relief under 28 U.S.C. § 2255, VACATE its judgment and reinstate the conviction and sentence.  The case is REMANDED to the district court for further proceedings not inconsistent with this opinion.

REVERSED, VACATED, and REMANDED.