IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-11514
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

OSAMA MAHMOUD ABDALLAH;
MOHAMMAD MAHMOUD ABDALLAH,

Defendants-Appellants.

Appeal from the United States District Court for
the Northern District of Texas
(USDC No. 4:01-CR-108-2-A)
_____
September 6, 2002

Before REAVLEY, BARKSDALE and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Appellants appeal from their conviction for food stamp fraud (Mohammad

Mahmoud Abdallah) and conspiracy to commit food stamp fraud (Mohammad Mahmoud

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

and Osama Mahmoud Abdallah), based on discounted cash payments made to convenience store customers, some of whom were undercover agents, in exchange for benefits out of Lone Star Card food stamp accounts. They also appeal the district court's sentencing calculations under the guidelines. We affirm.

A.     <u>Sufficiency of the Evidence</u>

Osama Mahhoud Abdallah and Mohammad Mahmoud Abdallah challenge, with substantially identical briefing, the sufficiency of the evidence to support their convictions for conspiracy to commit food stamp fraud under 7 U.S.C. § 2011. In reviewing the sufficiency of the evidence, we "view the evidence in the light most favorable to the jury verdict and affirm if a rational trier of fact could find that the government proved all essential elements beyond a reasonable doubt." <u>United States v. Giraldi</u>, 86 F.3d 1368, 1372 (5th Cir. 1996). We consider all the evidence, both in support of and contrary to the verdict. <u>Id.</u>

Appellants argue that there was no direct evidence of a conspiracy and no circumstantial evidence showing that the money obtained from the food stamp accounts was shared among all the defendants. The United States has identified substantial circumstantial evidence in the record that there was an agreement among the parties to purchase food stamps at a discount for cash and to mask large transactions by dividing them between two or more stores. It is well-settled that the government may demonstrate

2

the existence and elements of a conspiracy with circumstantial evidence.  United States v. Burns, 162 F.3d 840, 849 (5th Cir. 1998).  Appellants point to testimony by two witnesses that the money obtained from the food stamp transactions was not shared by the alleged members of the conspiracy, but they have not explained why, as a matter of law, it was necessary for the government to prove that the proceeds of any particular transaction were shared or divided up among the participants in the conspiracy.  There was sufficient evidence to support the jury's verdict under Count I of the indictment.

B.     Outrageous Government Conduct

Both Appellants argue with reference to United States v. Russell, 411 U.S. 423 (1973), and Brady v. Maryland, 373 U.S. 83 (1963), that the government should have been barred from obtaining a conviction against Osama and Mohammad because: (a) it withheld material evidence until a week before trial, and (b) the government authorized Osama and his store to continue accepting food stamps even though the government suspected him and the store's owner of fraud, in violation of federal regulations.  Neither argument is convincing.

1.     Brady violation

A Brady violation exists where the evidence at issue is favorable to the accused, the government suppressed it, and the defendant was prejudiced.  United States v. Hughes, 230 F.3d 815, 819 (5th Cir. 2000).  The defendant must show a reasonable

3

probability that if the exculpatory evidence had been properly turned over, the result would have been different. Kyles v. Whitley, 514 U.S. 419, 434 (1995); Hughes, 230 F.3d at 819. We review Brady claims *de novo*. Id.

Appellants argue that the government violated Brady by failing to disclose evidence until a week before trial that a USDA official named Georgina Telley or Tellez had animus toward Osama and Mohammad because she overheard Noel Abdallah call her a "bitch." No prejudice has been shown with respect to the allegedly delayed disclosure of this comment. Appellants have not clearly explained how they think introduction of this comment would have affected the jury's verdict. There is no explanation of how Georgina Telley or Tellez might have had any impact on the government's undercover investigations of the Abdallah brothers. To the extent appellants have suggested this evidence might have been used to impeach a trial witness named Georgina Castillo, who may or may not have been the same person as Georgina Telley or Tellez, appellants' attorneys did not even ask Ms. Castillo at trial whether she had ever been called a "bitch" by a member of the Abdallah family.

## 2. Other Outrageous Conduct

Appellants state that the government violated its own regulations by continuing to allow the Abdallah-owned and/or operated stores to continue participating in the food stamp program despite suspicions of fraud, in violation of federal regulations. According to appellants, this conduct is "so outrageous that due process principles . . . absolutely bar

4

the government from invoking judicial processes to obtain a conviction." <u>Russell</u>, 411 U.S. at 431-32. Not only have appellants failed to identify the regulations they claim were violated, but there is no explanation as to why it was unfair, much less outrageous, that the government allowed the stores to continue their participation in the food stamp program. The proposition is not an intuitive one that we will accept without some explanation or authority. Furthermore, there is no explanation as to why the government's failure to turn over information about its December 1996 suspicions of food stamp trafficking at the Abdallah stores until one week before trial was prejudicial, so as to constitute a separate <u>Brady</u> violation.

C.      <u>Entrapment of Mohammad Mahmoud Abdallah</u>

Mohammad argues that he was entrapped by undercover federal agents, who sought to induce him and intimidate him into giving them cash for food stamps. Under the affirmative defense of entrapment, once the defendant makes a prima facie case that he was induced to commit the crime by government officials and that he was not predisposed to engage in the criminal conduct, an entrapment instruction must be given and the burden shifts to the government to prove beyond a reasonable doubt that the defendant was *either* predisposed to commit the offense *or* was not induced. <u>United States v. Pruneda-Gonzalez</u>, 953 F.2d 190, 197 (5th Cir. 1992); <u>United States v. Thompson</u>, 130 F.3d 676, 689 (5th Cir. 1997). In the present case, the jury concluded beyond a reasonable doubt that Mohammad was not entrapped as to any count in the

5

indictment.  We review the jury's finding for sufficiency of the evidence.  Id. at 688-89.

The evidence showed that, at least with respect to a couple of the counts, government agents were persistent in attempting to obtain cash for benefits, for example when an agent came back to the store within the same afternoon after an initial brush-off to confirm a correct PIN for her card, or when an agent told Mohammad that she had "never had a problem" getting a large amount of cash from another employee.  However, we need not conclusively resolve whether these tactics rose to the level of inducement, because there was in any event ample evidence for the jury to conclude that Mohammad was predisposed to engage in food stamp fraud, based on evidence of: the number of transactions, some of which involved no apparent resistance; the fact that any resistance was short-lived (as opposed to being worn down by an agent only after a period of pleading or harassment); the fact that he took a profit on the transactions rather than providing full cash value of the benefits to the customer, as would be consistent with his explanation that he was simply trying to get the customers to leave the store quickly; his coordination of transactions with other stores; and his instruction on August 12 to an undercover agent that if she came back into the store for another transaction, not to ask for any other employee if she did not see him.  The jury was entitled to conclude from all the circumstances that Mohammad did not cave into badgering or a perceived threat from the undercover agents, but was predisposed to commit food stamp fraud for personal gain.


D.      Sentencing Challenges

Both appellants challenge the district court's findings of fact with respect to several sentencing enhancements. We review the district court's findings of fact in support of these enhancements for clear error. United States v. Canada, 110 F.3d 260, 262-63 (5th Cir. 1997).

1.      Osama Mahmoud Abdallah's Organization and Leadership

Osama challenges the district court's finding at sentencing that he was an organizer and leader in the conspiracy to commit food stamp fraud (U.S.S.G. § 3B1.1(A), four level increase), and that he engaged in more than minimal planning (U.S.S.G. § 2F1.1(b)(2)(A) (2000), two level increase).[1] He argues that he could not have been a leader or organizer of the activity because no money or benefits were shared after each fraudulent transaction among the participants of the conspiracy. This is a non-sequitur; that each store kept its own "take" after dividing a large Lone Star Card transaction does not demonstrate a lack of participation in the illegal conduct. The district court accepted the probation officer's conclusion in the presentence report that Osama had instructed at least one employee and participant in the unlawful food stamp transactions (Hatem

[1] Sentencing in this case occurred on November 16, 2001. Section 2F1.1(b)(2)(A) was deleted from the guidelines effective November 1, 2001, and the considerations related to fraud were consolidated in §2B1.1. It is not clear that the "minimal planning" enhancement was carried over into §2B1.1, or whether Osama would have been better or worse off under the revisions. Osama Abdallah did not object at sentencing to the district court's reliance on §2F1.1(b)(2)(A), nor has he raised this issue as a point on appeal. If it was error for the district court to rely on §2F1.1(b)(2)(A), any objection has been waived.

7

Abdallah) to pay cash for benefits, and Osama has not addressed this finding or its significance. See United States v. Okoli, 20 F.3d 615, 616 (5th Cir. 1994) (directing only one other participant in the activity may make one eligible for the organizing and leading enhancement).

To the extent that Osama argues he was not involved in the planning associated with the fraud, the district court was entitled to rely on all the same circumstantial evidence that supported the jury's conspiracy verdict, discussed above. See United States v. Navarez, 38 F.3d 162, 166 (5th Cir. 1994) (explaining that the district court's findings are not clearly erroneous if they are "plausible in light of the record reviewed in its entirety"). The guidelines comments also make clear that "more than minimal planning" is "deemed present in any case involving repeated acts over a period of time," U.S.S.G. § 1B1.1, comment. (n.1(f)) (2000), and so is not necessarily dependent on more explicit planning evidence.

2.      Loss Determination under U.S.S.G. § 2F1(b)(1)

Both appellants challenge the district court's loss calculations, arguing that the court clearly erred by setting fifty dollars as the amount triggering a likelihood that a particular food stamp transaction was fraudulent. We do not find this determination to be clearly erroneous, given unrebutted statements included in the presentence report taken from people who worked at or owned convenience stores, that transaction amounts of forty dollars were likely to be fraudulent. The district court's use of the fifty dollar

figure, which added a ten dollar safety margin to the lower estimates to exclude all transactions under fifty dollars from the loss calculation, was entirely reasonable in light of all the testimony.[2]

With respect to Mohammad's additional argument that his total loss calculation should only have been $4,577.35, the district court's much higher loss determination of $661,490 was based on use of the fifty dollar baseline as applied to electronic records of *all* Lone Star Card food stamp transactions, the totals of which are compiled in paragraph 25 of his presentence report (excluding Future Food Mart). There is no explanation as to why the district court erred by considering the more comprehensive total derived from *all* likely illegal transactions attributable to Mohammad, instead of the specifically identified transactions listed in paragraph 17.

3.      Mohammad Mahmoud Abdallah's Claim of Incorrect Guideline Calculation

Finally, Mohammad argues in three sentences with no explanation or analysis that his total offense level should have been only ten. In the absence of any discussion, we can only assume that this argument is premised on the substantive sentencing enhancement point of error relating to Mohammad's loss calculation, and for the reasons

---

[2] The $100 figure used by appellants to support their argument that the district court improperly "split the baby" in deciding on the $50 number, was suggested by case agents as the amount that could be deemed with "utmost confidence" to be fraudulent. However, those same case agents believed that fifty dollars would be a more appropriate figure from which to base a calculation of fraudulent food stamp transactions.

stated above we find no clear error.

AFFIRMED.