UNITED STATES of America

v.

Carlos PEREA aka "Shotgun", Manuel Cardoza aka "Tolon", Benjamin Alvarez aka "T–Top", Eugene Mona aka "Gino" and Said Francisco Herrera aka "Shorty".

No. EP–08–CR–059–DB.

United States District Court,
W.D. Texas,
El Paso Division.

June 10, 2009.

Jose Luis Acosta, U.S. Attorney's Office, El Paso, TX, for Plaintiff.

Gary B. Weiser, Attorney at Law, Vivek Grover, Vivek Grover Attorney at Law, Robert J. Perez, Attorney at Law, Russell M. Aboud, Attorney at Law, Francisco F. Macias, Law Office of Francisco F. Macias, Kenneth Del Valle, Attorney at Law, El Paso, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

DAVID BRIONES, District Judge.

On this day, the Court considered Defendant Benjamin Alvarez's "Motion For New Trial," filed in the above-captioned cause on April 9, 2009. The Court also considered Defendants Said Francisco Herrera, Carlos Perea, Manuel Cardoza, and Eugene Mona's Motions for New Trial, filed in the above-captioned cause on April 12, April 13, April 15, and April 16, 2009.[1] On April 16, 2009, the United States of America ("the Government") filed a "Response To Defendant's Motion For Dismissal And New Trial." After due consideration, the Court is of the opinion that Defendants' Motions should be denied for the reasons that follow.

### FACTS

On January 9, 2008, the Grand Jury returned an eleven-count Indictment, charging Defendants in various counts. The Grand Jury specifically charged Perea, Cardoza, Alvarez, and Herrera with engaging in the affairs of an enterprise through a pattern of racketeering behavior ("RICO violations"), and charged Perea, Cardoza, Alvarez, Mona, and Herrera with conspiring to conduct the affairs of an enterprise through a pattern of racketeering behavior ("RICO conspiracy").[2] The Indictment alleged that the criminal charges stemmed from the operation of an extortion scheme by the Barrio Azteca enterprise ("BA"), an established prison gang operating in El Paso, Texas. On November 3, 2008, a jury trial commenced in the above-entitled and numbered cause. Defendants were present and represented by counsel. The Jury was empaneled on November 3, 2008, and the presentation of evidence commenced on November 4, 2008. During the pendency of the trial, the Jury heard the testimony of multiple witnesses and viewed innumerable exhibits. Eight (8) witnesses were confirmed BA members, and one (1) witness was linked to the BA but was not an official member.

The testimony at trial established that the BA charged drug traffickers ("tiendas") a percentage of drug proceeds ("cuota") for running their businesses in BA territory. In return, payment of cuota ensured BA protection such that the tiendas could operate safely. This extortion scheme assisted the BA in funding the

---

1. On April 12, 2009, Defendant Said Francisco Herrera filed a "Motion For Dismissal On The Basis Of Brady Violations Or In The Alternative For A New Trial." On April 13, 2009, Defendant Carlos Perea filed a "Motion For Dismissal On The Basis Of Brady Violations Or In The Alternative For A New Trial." On April 15, 2009, Defendant Manuel Cardoza filed a "Motion For New Trial," and on April 16, 2009, Defendant Eugene Mona filed a "Motion For New Trial." Although filed separately and distinctly titled, the Motions filed by the Defendants are identical, asserting the same arguments and seeking the same relief. Indeed, many—if not all—the Motions appear to be no more than Defendant Benjamin Alvarez's Motion copied four (4) additional times.

2. Perea, Cardoza, and Alvarez were also charged with conspiring to launder monetary instruments and conspiring to possess a controlled substance with the intent to distribute same. Herrera was also charged with conspiring to possess a controlled substance with the intent to distribute same as well as conspiracy to interfere with commerce by threats or violence and assault in aid of racketeering activity.

prison accounts of BA members located in various state and federal prisons across the United States. Specifically, BA members sent money, usually in the form of money orders, through the United States ("U.S.") Postal Service to imprisoned BA members.

The testimony at trial further established that the BA command structure was para-military in nature. As such, BA members moved up through the ranks from soldier to captain ("capo"). Orders were issued through higher-ranking members and capos, specifically, to maintain order within the BA organization and to continue the BA's money-making scheme. Additionally, testimony at trial revealed that a non-compliant BA member or one that was harming the organization could face severe punishment issued through a "green light." Punishment issued through a green light ranged from a physical altercation to death.

On December 2, 2008, the Jury returned a verdict, finding Perea, Alvarez, Cardoza, and Herrera guilty of RICO violations, and finding Perea, Cardoza, Alvarez, Mona, and Herrera guilty of RICO conspiracy.[3] On April 13, 2009, Sentencing was held as to the above-named Defendants. The instant Motions followed.

## DISCUSSION

In the instant Motions, Defendants argue that information contained in the Pre-Trial Services Report ("PSR") filed prior to the Sentencing was never disclosed to

Defendants in discovery.[4] Specifically, Defendants allege that paragraphs 56, 57, 62, 63, 64, and 65 of the PSR demonstrate that murders were ordered by BA members Eduardo Ravelo, aka "Tablas," ("Ravelo") and Miguel Angel Esqueda, aka "Angelillo," ("Esqueda"). Defendants contend that this evidence would have increased the culpability of Ravelo and Esqueda while diminishing their own guilt. Alvarez in particular hypothesizes that this discovery would have further underscored his theory that Ravelo was the BA capo issuing green lights and running the BA organization. Further, Defendants argue that two (2) trial witnesses, Gustavo Gallardo, aka "Tavo," ("Gallardo") and Gerardo Hernandez ("Hernandez"), were involved with the execution of those murdered. Defendants argue that Gallardo and Hernandez's involvement in these murders would have materially altered the manner in which those witnesses were cross-examined, thereby illuminating the untrustworthiness of these witnesses and exposing these witnesses' motivation in testifying. As such, Defendants contend that the failure to disclose this evidence constitutes a *Brady* violation, thereby violating Defendants' Fifth and Sixth Amendment rights, warranting a new trial. Lastly, Defendants contend that the manner in which the Jury was transported to and from the courthouse was unduly prejudicial.

The Government counters that Defendants, in fact, received the Federal Bureau

---

**3.** The Jury also found Perea, Cardoza, and Alvarez guilty of conspiring to launder monetary instruments and conspiracy to possess a controlled substance with the intent to distribute same. Herrera was also found guilty of conspiracy to possess a controlled substance with the intent to distribute same as well as conspiracy to interfere with commerce by threats or violence. The Jury did not, however, reach a verdict as to whether Herrera

committed assault in aid of racketeering activity.

**4.** While a separate PSR was filed as to each Defendant, the contested paragraphs, taken from "The Offense Conduct" portion of the PSRs, were identical in each separately-filed PSR for each of the five (5) Defendants. Accordingly, the Court will refer only to one (1) PSR.

of Investigation ("FBI") 302 reports ("302s") that expressly included the information at issue in the PSR. Indeed, the Government argues that it resubmitted the 302s to defense counsel during the trial as defense counsel was dissatisfied with the lack of information identifying confidential sources in the originally disclosed 302s. Further, even assuming defense counsel did not receive the 302s, the Government asserts that the vast majority of the information at issue was not based on personal knowledge and could not be perceived as linking Gallardo or Hernandez to the murders discussed in the PSR. Nevertheless, the Government concedes that Gallardo can be shown to have had personal knowledge of one murder at issue in paragraph 64, but the Government emphasizes that Defendants thoroughly cross-examined Gallardo as to this murder. Next, the Government contends that both Gallardo and Hernandez were thoroughly impeached on the basis of their extensive criminal history, gang activity, and potential motives for testifying. Despite Defendants' arguments to the contrary, the Government propounds that ample evidence connected Defendants to the BA scheme and that the Jury believed the evidence linked Defendants to that scheme beyond a reasonable doubt, despite the thorough impeachment of Gallardo and Hernandez. The Court agrees with the Government and further finds that transportation provided to the Jury was entirely appropriate.

---

**5.** A court reviewing a motion for new trial based on a *Brady* violation employs a wholly different test than the five-factor test employed by a court reviewing a motion for new trial based on newly discovered evidence. *See United States v. Abdallah*, 2009 WL 1160963, at *53 (S.D.Tex. Apr. 29, 2009) (finding that the three-part *Brady* test is used to assess a motion for new trial based on a *Brady* violation as opposed to the five-part test governing motions for new trial).

## I. Motion for a New Trial Based on a Brady Violation

◼ In *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A defendant seeking a new trial based on a Brady violation must prove that: "(1) the prosecution suppressed evidence; (2) the evidence was favorable to him; and (3) the evidence was material either to guilt or punishment." *United States v. Severns*, 559 F.3d 274, 278 (5th Cir.2009).[5] The Court examines each element below.

### A. Suppression of Evidence

As a preliminary matter, the Court addresses the first element: whether the prosecution in the instant case suppressed evidence. Defendants contend that they never received in discovery the information that formed the basis of the PSR. The Government counters that Defendants received the 302 reports from which the information was taken on several occasions. The Court agrees with the Government.

A comparison between the PSR and the 302 reports which form the basis of the PSR reveals that the PSR recounts, nearly verbatim, the information contained in the 302 reports.[6] For example, paragraph 56

---

**6.** The Court thoroughly compared the challenged paragraphs to the corresponding 302 reports. As stated above, the PSR presents an abridged version of the information contained in the 302 reports, excising information that does not directly relate to Defendants.

The Court did, however, note one (1) difference between the PSR and the 302 reports. Paragraphs 62, 64, and 65 state that certain green lights, culminating in murder, were issued at the direction of the BA capos, presum-

is an abridged version of two (2) 302 reports, relating that Jesus Arguelles Palos ("Palos") had been murdered at a restaurant in Ciudad Juarez and indicating that a confidential informant ("CI") believed that Perea sent a letter ordering this murder. In the presence of the Court, Defendants' attorneys raised—during trial— their belief that the Government had not disclosed all 302 reports. Counsel for the Government indicated that discovery of the 302 reports had been made available and that Defendants' attorneys were invited to review the 302 reports in the Government office. Indeed, Defendants' attorneys later acquiesced, agreeing that the Government had, in fact, complied with discovery and had provided the 302 reports to Defendants.[7] Further, the Court ordered, and the record reflects, that the Government disclosed anew the 302 reports in an altered format, as per the request of Defendants' attorneys. Undoubtedly, the Government at no time suppressed the evidence—the 302 reports— that formed the basis of the PSR. Nevertheless, for purposes of the instant Motion and to be thorough, the Court will assume that the Government did indeed suppress the 302 reports.

### B. Favorable Evidence

Next, the Court determines whether the evidence referenced in the PSR was favorable to Defendants. Defendants essentially make two (2) claims regarding this evidence. First, Defendants claim that this evidence further inculpated Ravelo and Esqueda while diminishing their own guilt. Second, Defendants claim that this evidence reveals Gallardo and Hernandez's own involvement in various murders and, therefore, could have rendered cross-examination more effective and could have been used for impeachment purposes.

 Courts do not distinguish between impeachment evidence and other exculpatory evidence. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Indeed, the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") has held that "impeachment evidence is 'evidence favorable to an accused' ... 'that, if disclosed and used effectively, ... may make the difference between conviction and acquittal.'" *Wilson v. Whitley,* 28 F.3d 433, 437 (5th Cir.1994) (quoting *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375). If a jury would have to grapple with suppressed evidence when compared to the evidence presented at trial, a court will err on the side of caution

---

ably at the direction of Perea, Cardoza, and Alvarez. Nothing in the corresponding 302 reports directly states that the acts described in paragraphs 62, 64, and 65 were at the direction of the BA capos. The Court addresses the impact of this omission under the third element of the *Brady* test.

7. The transcript of the proceedings reveals the following exchange between Perea's counsel, Mr. Gary Weiser ("Mr. Weiser"), and the Court that occurred outside the presence of the jury:

> Mr. Weiser: I was advised yesterday during one of the breaks ... that there were additional 302s involving Mr. Gallardo. This morning I was provided with those additional 302s.

. . .

> The Court: Why—why would they—why were these 302s provided so late to begin with?
>
> Mr. Weiser: Your Honor, the 302s were provided. And let me clarify that point. I haven't seen them, but one of my co-counsel indicates it was part of the discovery that was provided.

Further, in this exchange between Mr. Weiser and the Court, Mr. Weiser stated in referring to the 302 reports, "And I think that the U.S. Attorney has complied in good faith with the rules." Counsel for Cardoza, Alvarez, Mona, and Herrera were present for this exchange and at no time contradicted Mr. Weiser's statements to the Court.

and presume that such suppressed evidence is favorable. *See United States v. Hughes*, 230 F.3d 815, 820 (5th Cir.2000) (indicating that a jury would have to grapple with certain contradictory statements, even though interpretations of the statements are debatable). As such, the Court examines the challenged PSR paragraphs [8] and determines whether the information contained in those paragraphs, if disclosed, would have been favorable to Defendants in that it was either exculpatory or could have been used to further impeach Gallardo or Hernandez.

Paragraph 56 addresses a news report covering the murder of Palos. This paragraph indicates that Cardoza wrote a letter to Ravelo, directing Ravelo to "clean up [Palos'] shit" if Palos did not do it himself. Rather than exculpating the Defendants, paragraph 56 inculpates Cardoza, identifying him as the individual directing Ravelo's acts. Consequently, this paragraph does not present exculpatory evidence, nor does this paragraph include information which could be used to impeach Gallardo or Hernandez, as these testifying witnesses are not even mentioned in paragraph 56.

Paragraph 57 indicates that Johnny Micheletti, a testifying witness, informed FBI agents that Ravelo, in fact, killed Palos. Given Defendants' assertion that Ravelo was one (1) of two (2) BA members directing the affairs of the BA, this paragraph, when viewed in isolation, presents favorable evidence: it increases Ravelo's culpability while decreasing that of the Defendants'. Nevertheless, paragraph 56 established that Cardoza directed Ravelo to "clean up [Palos'] shit." As the jury would be required to determine whether Cardoza's letter directed Ravelo to kill Palos, the Court will presume for purposes of these Motions that this evidence is favorable in that it is exculpatory. *See Hughes*, 230 F.3d at 820. Nevertheless, paragraph 57 did not contain evidence with which Gallardo or Hernandez could have been impeached as, again, these testifying witnesses were never mentioned in paragraph 57.

Next, paragraph 62 indicates that a confidential source—identified by the Government in its Response as Gallardo—reported that Antonio Alsarez, Ivan Ortiz, and Jesus Vital were murdered and that Ravelo issued the green light directing these murders. Indeed, this evidence would tend to exculpate Defendants as Ravelo is identified as the BA member issuing green lights that direct murders. Nevertheless, Gallardo does not report any personal knowledge as to these green lights and merely reports the information secondhand. Hernandez, on the other hand, is never mentioned in paragraph 62. As such, paragraph 62 contains exculpatory—but not impeachment—evidence favorable to Defendants.

Paragraph 63 indicates that a confidential source—identified by the Government in its Response as Hernandez—reported that Arturo Jaramillo Morillon was killed in Ciudad Juarez and that Ravelo had ordered the "hit" because of a drug debt. Much like paragraph 62, nothing indicates that Hernandez had personal knowledge of this murder nor that he was involved in this murder; rather, this paragraph merely indicates that Hernandez heard this information from some other source. Further, Gallardo is never mentioned in this paragraph. Thus, this evidence, like the evidence in paragraph 62, would tend to exculpate Defendants and inculpate Ravelo without providing any impeachment evi-

---

**8.** As stated previously, the Court thoroughly compared the challenged paragraphs to the corresponding 302 reports and noted only one (1) difference.

dence which could have been used on the cross-examinations of Gallardo or Hernandez.

Unlike the challenged paragraphs discussed above, paragraph 64 implicates Gallardo in the abduction and murder of Mike Flores ("Flores"). Hernandez reported that David Merez ("Merez"), a BA capo, turned Flores over to the Vicente Carrillo Fuentes Drug Trafficking Organization ("VCFDTO"). Gallardo, who was ordered to assist in Flores' abduction and who was present at the time of Flores' delivery to the VCFDTO, indicated that Ravelo was involved. While the information is favorable to the Defendants in that it tends to exculpate them while further inculpating other BA capos, this paragraph also references evidence which could have been used to impeach Gallardo. As Gallardo testified at trial against Defendants, Gallardo could have been impeached as to his own involvement in Flores' abduction and murder. Again, however, Hernandez is never mentioned in this paragraph. Nevertheless, this paragraph does, in fact, reference evidence favorable to Defendants.

Lastly, paragraph 65 indicates that Gallardo reported that Merez had been murdered. Further, the paragraph states that Gallardo believed Ravelo and Esqueda were responsible for this murder. The paragraph concludes by indicating that the FBI intercepted a letter from Perea to Esqueda ordering Merez's murder. Rather than being exculpatory, this paragraph contains evidence that inculpates Perea, if not the other BA capos. Indeed, Perea's counsel questioned testifying witnesses repeatedly regarding this letter and whether it had ever been given to a BA member. Finally, nothing in paragraph 65 suggests that Gallardo or Hernandez had any personal knowledge regarding this murder. As such, paragraph 65 contains exculpatory evidence to the extent that Ravelo and

Esqueda are again inculpated—although Perea's own culpability is also at issue, but paragraph 65 does not contain any impeachment evidence favorable to Defendants.

*C. Materiality*

Having determined that paragraphs 57, 62, 63, 64, and 65 contain evidence which could be favorable to Defendants, the Court next determines whether this evidence is material either to guilt or innocence. To reiterate, Defendants claim that this evidence demonstrates Ravelo and Esqueda's greater culpability while diminishing their own and that this evidence could have been used to impeach Gallardo and Hernandez. The Government counters that Gallardo and Hernandez were thoroughly impeached at trial regarding their extensive criminal history and what they hoped to gain by testifying. The Government notes that Gallardo was even cross-examined as to his participation in the abduction and murder of Flores. The Court examines the materiality of this evidence below.

 "Evidence is material if there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Severns,* 559 F.3d at 278 (quoting *United States v. Runyan,* 290 F.3d 223, 247 (5th Cir.2002)). Evidence creates a reasonable probability of altering the result of the proceeding when "'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Hughes,* 230 F.3d at 820 (quoting *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Further, as was stated previously, courts make no distinction between exculpatory and impeachment evidence. *Wilson,* 28 F.3d at 437. As such, a review

of the materiality of either type of evidence " 'depends almost entirely on the value of the evidence relative to the other evidence mustered by the [prosecution].' " *Id.* at 439 (quoting *Edmond v. Collins*, 8 F.3d 290, 293 (5th Cir.1993)). For example, while a court reviews impeachment evidence to determine whether it could have been used "to significantly undermine [a witness'] credibility," *Wilson*, 28 F.3d at 440, a court also reviews whether a witness' credibility was tested on other grounds. *Hughes*, 230 F.3d at 820–21. Thus, where a court determines that a witness was thoroughly impeached despite the prosecution's suppression of favorable evidence, the materiality of that evidence will not be such that it could undermine confidence in the verdict. *See id.* at 821 ("The ... impeachment of [the witness] that occurred at trial and the other evidence demonstrating [the defendant's] knowledge beyond a reasonable doubt convince us that the 302 interview that the government failed to turn over to [the defendant] was not material for the purpose of *Brady*.").

### 1. Exculpatory Evidence

█ First, the Court determines whether the favorable exculpatory evidence discussed above would have resulted in a different outcome for Defendants, if disclosed.[9] As previously noted, PSR paragraphs 57, 62, 63, 64, and 65 all indicate that Ravelo and Esqueda murdered the listed individuals themselves or ordered the green lights which directed these murders. Indeed, this evidence would tend to show that Ravelo and Esqueda were leaders within the BA organization and issued orders. Nevertheless, neither Ravelo nor Esqueda's involvement in these acts negates Defendants' own culpability in the instant case. First, the testimony at trial established that an order required the approval of three (3) BA capos. Multiple witnesses identified Perea, Cardoza, and Alvarez as capos.[10] Further, despite the difficulty Perea, Cardoza, and Alvarez had in communicating beyond prison walls, correspondence from these particular Defendants was reportedly received by various BA members—copies of which were received into evidence at trial and in which handwriting was verified. Indeed, Cardoza reportedly sent a letter ordering the green light on Palos, and although intercepted by the FBI, Perea sent a letter ordering Merez's murder.

Second, while an order required approval of three (3) BA capos, testimony at trial also indicated that the BA was plagued with in-fighting among various factions within the organization.[11] Indeed, the murder of Jose Luis Oviedo ("Oviedo") was the culmination of a cuota-collection that simply got out of control but that did not have the approval of three (3) BA capos. As such, the evidence at trial established that, in all likelihood, BA capos—including, at a minimum, Perea and Cardoza—managed to communicate with BA leadership outside of prison, giving orders and directing BA affairs. Additionally, the

---

9. The Court reiterates that the 302 reports at issue in the instant Motion, and upon which the PSR was based, were most definitely produced by the Government, at the latest, during trial.

10. On cross-examination by Mr. Weiser, Hernandez identified Perea, Alvarez, Cardoza, Merez, and later Ravelo, as capos.

11. On Gallardo's cross-examination by Mr. Robert Perez, counsel for Alvarez, Gallardo testified extensively regarding the power struggle within the BA. Largely based on the capos' inability to receive money in their prisoner accounts, leadership of the BA vacillated between Merez and Esqueda in the United States while Ravelo conducted the BA's affairs in Ciudad Juarez.

evidence also established that in-fighting caused great confusion among the BA and that, oftentimes, orders were issued without approval of the BA capos and occasionally resulted in mistakes—as was the case in Oviedo's murder.

Third, and most importantly, all five (5) of the above-captioned Defendants were found guilty of RICO conspiracy. A person engages in RICO conspiracy if he "conspire[s] to violate any of the provisions of" 18 U.S.C. § 1962. 18 U.S.C.A. § 1962(d) (West 2000). To convict a defendant of RICO conspiracy, the Government must prove "(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Posada–Rios*, 158 F.3d 832, 857 (5th Cir.1998). A defendant need only agree to the overall criminal objective; he need not agree to perform the actual crime or crimes constituting the RICO conspiracy. *United States v. Marmolejo*, 89 F.3d 1185, 1196 (5th Cir.1996). Indeed, "[u]nder the [RICO] statute, it is irrelevant that each defendant participated in the enterprises's affairs through different, even unrelated crimes, so long as [the court] may reasonably infer that each crime was intended to further the enterprise's affairs." *United States v. Elliott*, 571 F.2d 880, 902–03 (5th Cir.1978).

Here, evidence of the participation of all five (5) of the listed Defendants in the RICO conspiracy was thorough and extensive.[12] The Government submitted intercepted letters and wire-tapped phone calls. Additionally, the Government entered into evidence extensive records detailing Perea,

Cardoza, and Alvarez's acceptance of BA funds into their prisoner accounts. Eight (8) BA members and one (1) BA associate testified against Defendants, and Mona testified on his own behalf. At the very least, the evidence at trial established that Defendants agreed to the overall objective of the RICO conspiracy inasmuch as Defendants were members—inclusive of high-ranking members—of the BA. In short, in addition to the other charges discussed above, the Jury believed that Defendants were guilty beyond a reasonable doubt of RICO conspiracy. Thus, while the evidence included in the PSR suggests that Ravelo and Esqueda were responsible for the murders discussed in paragraphs 57, 62, 63, 64, and 65, this evidence does not negate Defendants' own involvement in the RICO conspiracy at issue, as Defendants' participation in those specific murders is irrelevant. *See Elliott*, 571 F.2d at 902–03. Therefore, the Court finds that the favorable exculpatory evidence identified by Defendants—evidence inculpating Ravelo and Esqueda—is not material in that, if disclosed, it would undermine the Jury's verdict.[13]

#### 2. Impeachment Evidence

Next, the Court determines whether any suppressed impeachment evidence constitutes material evidence which could have affected the outcome of the case. Before turning to the impeachment evidence pertaining to Gallardo which the Court identified previously, the Court preliminarily notes that the PSR contains no information which could have been used to impeach Hernandez. Hernandez never disclosed any personal knowledge of any of

---

12. Evidence at trial established that Perea, Alvarez, and Cardoza were BA capos, directing the leadership outside of prison and issuing orders, while Mona was a "bridge"—one used to communicate between BA members, and Herrera was a foot soldier.

13. The Court notes that Ravelo and Esqueda were also indicted in the instant case. Ravelo remains a fugitive, and Esqueda entered a plea agreement.

the events he related,[14] and the PSR does not disclose any involvement on Hernandez' part in any murder. Nevertheless, Defendants' attorneys thoroughly impeached Hernandez on the basis of his criminal history and his incentives for testifying against Defendants. For example, on cross-examination by counsel for Alvarez, Hernandez confirmed that he had been a felon since the early 1990s and that Hernandez imported heroin and cocaine and transported these drugs to New York on a regular basis. Further, Hernandez confirmed in this same cross-examination that he received immunity from the Government for his own involvement in any RICO violations and that he expected a reduction in his sentence. Herrera's attorney, Mr. Ken Del Valle ("Mr. Del Valle"), went so far as to suggest that Hernandez had the motive to personally draft a letter inculpating Perea that Hernandez turned over to the FBI, claiming he received it from Perea. In short, Defendants impeached Hernandez on the basis of his own criminal history and what he gained by testifying as a cooperating witness—all of which bore on Hernandez's credibility.

Finally, the Court examines the evidence regarding Gallardo's involvement in Flores' murder—the only evidence inculpating Gallardo—and determines whether, if disclosed, it could have been used to significantly undermine Gallardo's trial testimony such that a verdict of not-guilty would have been the probable outcome. While evidence regarding Gallardo's personal involvement in the abduction and murder of Flores is certainly favorable, unfortunately for Defendants, it cannot be material. Further underscoring the Court's finding that Defendants did, in fact, receive the 302 reports which formed the basis of the PSR, Defendants were well aware of Gallardo's involvement in Flores' abduction and murder at trial. Indeed, Gallardo was cross-examined as to his own participation in this criminal act.[15] In short, Gallardo could not be any further impeached as to his participation in the abduction and murder of Flores as he was *already* impeached on this ground at trial.

Additionally, like Hernandez, Defendants thoroughly impeached Gallardo on the basis of his extensive criminal history and his motives in testifying as a cooperating witness. During cross-examination, Gallardo informed the jury that he received 144 months, or twelve (12) years, for a federal offense of importing greater than 2000 pounds of marijuana. Although sentenced to 144 months, Gallardo only served seventy-two (72) because he cooperated with the Government on a murder investigation and was eventually released in 1996. Despite this break, Gallardo again went to prison in January 2007 for trafficking 100 kilograms of cocaine. Again, Gallardo cooperated with the Government and recently pled to a sentence of

---

14. When asked on cross-examination how he knew that Gallardo had participated in Flores' abduction and murder, Hernandez began with, "I was told by," but never finished his statement as counsel for Mona interrupted him with, "Okay. That's enough. You didn't know that. You weren't there?," to which Hernandez confirmed that he was not present.

15. The following exchange occurred on Mr. Del Valle's cross-examination of Gallardo.

Mr. Del Valle: From your experience on the street, you're telling the ladies and gentlemen of the jury that when you saw a guy kidnapped, bound up, and being taken to Juarez, you had no idea what was going to happen to him?

Gallardo: I didn't know if they were going to let him go. I didn't know. I didn't even know where he was going. I didn't know where he was going.

Mr. Del Valle: Because you purposely blinded yourself to the fact, correct?

fifteen (15) years. Further, Gallardo was very forthcoming in his cross-examination and indicated that he hoped the Government would reduce his sentence below fifteen (15) years for his participation at trial. In short, Gallardo was thoroughly impeached on the basis of his extensive criminal history and his history of cooperating with the Government such that any evidence revealed in the PSR—had it not already been provided to Defendants—could not have been used to significantly undermine Gallardo's credibility. *See Wilson,* 28 F.3d at 440. Thus, the Court is of the opinion that the impeachment evidence favorable to Defendants was immaterial in that it could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *See Hughes,* 230 F.3d at 820. Therefore, having found the exculpatory and the impeachment evidence immaterial, the Court is of the opinion that Defendants' request for a new trial on the basis of *Brady* violations should be denied.

## II. Anonymous Jury

Lastly, Defendants contend that the procedures implemented for transporting the jurors throughout the trial were unduly prejudicial. Specifically, Defendants criticize the use of U.S. Marshal transportation, as the jurors were escorted by "armed" U.S. Deputy Marshals to secured parking at Ft. Bliss, a U.S. military base. The Court disagrees with Defendants and finds that the procedures implemented for the Jury were wholly appropriate.

In *United States v. Krout*—a case involving members of the Texas Mexican Mafia, the Fifth Circuit held that "a lower court's decision to empanel an anonymous jury is entitled to deference." 66 F.3d 1420, 1426 (5th Cir.1995). Further, the Fifth Circuit identified five (5) factors that may justify an anonymous jury:

(1) the defendants' involvement in organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and, (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment.

*Id.* at 1427. Thus, the Fifth Circuit upheld the district court's empanelment of an anonymous jury, including transportation of the jurors by a U.S. Deputy Marshal to parking at an undisclosed location, despite the district court's failure to provide a neutral explanation for the jury's anonymous status. *Id.* at 1427 n. 5.

■ Here, the instant case involves a prison gang accused of engaging in organized crime. Indeed, the BA's structure is para-military in nature. Further, while no threat was ever perceived against a juror, undoubtedly the BA, with its extensive ties to the VCFDTO, had the capacity to harm jurors. The majority of the Defendants faced sentences of life, and the case garnered extensive media coverage as early as the arraignment phase when Defendants were first arrested on the federal charges. This last factor—extensive media coverage—was the factor of most concern to the Court. Indeed, before and after empaneling the Jury, the Court expressed a number of times that it had no concern for the safety of the Jury but that it wanted to ensure the privacy of those who served.

Given these factors and the Court's concern for juror privacy, the Court arranged for U.S. Marshal transportation. At no time did a U.S. Deputy Marshal ever display a weapon; in fact, the U.S. Marshal's Code of Professionalism requires that all

service weapons be concealed from the public. Further, parking at Ft. Bliss was one (1) of several options discussed by the Court with the U.S. Marshals. While secured parking at the airport was also considered, the Court agreed that Ft. Bliss' central location and proximity to the courthouse made it the most desirable location. Despite the Court's efforts at assisting jurors in maintaining their privacy, the Court notes that two (2) of the jurors did not park at Ft. Bliss. Rather, the U.S. Deputy Marshals picked up one (1) juror at a bus stop while another juror opted to drive to the courthouse and park independently. In short, unlike the district court in *Krout,* the Court in the instant case made repeated assurances to the Jury that the provided transportation was to ensure anonymity and nothing more. The Court finds Defendants' arguments to the contrary unconvincing and is of the opinion that the instant Motion should be denied on this ground.[16]

## CONCLUSION

For the reasons stated above, the Court is of the opinion that Defendants' Motions for New Trial should be denied. First, the evidence at issue in the instant Motions— evidence drawn from various PSR paragraphs which were drafted using 302 reports—was disclosed to Defendants during trial if not before. Second, only some of the contested paragraphs contain evidence favorable to Defendants. Third, none of the favorable evidence identified by the Court is material. Defendants' own guilt was proven beyond a reasonable doubt based upon the evidence mustered by the Government at trial, and Gallardo and Hernandez were thoroughly impeached at trial as to their criminal history and as to

what they hoped to gain by cooperating. Indeed, Gallardo was even impeached as to the very evidence Defendants claim not to have received. Lastly, the Court finds that the procedures implemented to ensure the privacy of the Jury in the instant case were not unduly prejudicial. Therefore, the Court is of the opinion that Defendants' Motions should be denied.

Accordingly, **IT IS HEREBY ORDERED** that Defendant Benjamin Alvarez's "Motion For New Trial" is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Said Francisco Herrera's "Motion For Dismissal On The Basis Of Brady Violations Or In The Alternative For A New Trial" is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Carlos Perea's "Motion For Dismissal On The Basis Of Brady Violations Or In The Alternative For A New Trial" is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Manuel Cardoza's "Motion For New Trial" is **DENIED.**

**IT IS FINALLY ORDERED** that Defendant Eugene Mona's "Motion For New Trial" is **DENIED.**

---

**16.** Despite the Court's efforts to allay any assumption that Defendants' posed a threat to the jurors, attorneys for the Defendants opted to have their Defendants seated behind them and surrounded by U.S. Deputy Marshals rather than sit with counsel at the counsel table—a preference the Court found surprising.