# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-50176

United States Court of Appeals
Fifth Circuit

**FILED**

May 20, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

RAYMOND R. VALAS, III, also known as Raymond Valas, also known as
Raymond Richard Valas,

> Defendant - Appellant

Appeals from the United States District Court
for the Western District of Texas

Before JONES, WIENER, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

A jury convicted Raymond Valas of engaging in a commercial sex act with a minor in violation of 18 U.S.C. § 1591. Valas argues on appeal that the district court improperly instructed his jury on § 1591's scienter requirement. He also raises five alleged errors with his trial, arguing that each error alone—and the cumulative effect of the errors—requires the reversal of his conviction.

## I. Background

T.J., the victim in this case, was a runaway. She met Marcus Wright, one of her future pimps, at a bus stop. T.J. told Wright that she was fifteen years

old and a runaway, but Wright told her to tell everyone that she was eighteen and that her name was Barbie. Wright introduced her to Malcom Copeland and Amber Doak, who assisted him in recruiting and training potential prostitutes. The trio advertised their escorts / prostitutes on the website Backpage.com. Doak took pictures of T.J. for her internet profile. Doak explained to T.J. that she would be working by sleeping with many different men for money. T.J. received calls from potential clients on a cell phone provided by Wright. Some combination of Copeland, Wright, and Doak would transport T.J. to the prearranged location of her sexual encounters. For five days in 2013, T.J. was directed by Copeland and Wright to perform multiple sexual acts for money with several different men. One of these men was the Appellant, Raymond Valas.

Former U.S. Army Lieutenant Colonel Raymond Valas commanded Task Force Jaguar during its Beyond-the-Horizons exercise in El Salvador from April to June 2013. On August 26, 2013, Valas joined members of his New Hampshire National Guard Unit at the Hilton Hotel in San Antonio for a review of the exercise. Valas admitted to the jury that he met with T.J. at his hotel room briefly on two different nights: he claimed that he met and spoke with T.J. at the door to his hotel room for less than thirty seconds on August 26, and that he interviewed her in his hotel room for no more than fifteen minutes on August 27. Valas claimed that he interviewed T.J. as part of a research project he was working on. T.J. told a different story.

T.J. testified that on August 26, 2013, she began receiving messages from a man who said he was staying in Room 420 at the Hilton. After arranging the specifics, T.J. arrived at the hotel at 9:00 p.m. At trial, she identified Valas as the man in Room 420. T.J. claimed that Valas opened his hotel door wearing nothing but a towel. The first thing T.J. did after walking into Valas's hotel room was take $150 from a drawer in the nightstand: the price for thirty

minutes of her prostitution services. Valas then took off T.J.'s clothes and asked if she had a condom. Because neither of them had a condom, Valas instructed T.J. to perform sexual acts other than intercourse with him. According to T.J., Valas never asked her any questions about her background or history. When they were finished, T.J. left the hotel room and gave her pimp the $150, because he would beat her if she didn't give him the money.

T.J. began receiving text messages from Valas again the next afternoon. Phone records showed that Valas and T.J. exchanged eighteen phone calls and four text messages on the 27th, continuing until 12:50 a.m. that night, by then the early morning hours of August 28, 2013. T.J. went back to Room 420 at the Hilton to meet Valas. She told the jury that Valas handed her $150, and they both undressed. Valas put on a condom and had sex with T.J. Valas told T.J. that he was in San Antonio for work, and that he was surprised and pleased that the pictures on T.J.'s Backpage.com ad were not fake. After having sex with Valas, T.J. left the Hilton and called her pimp for a ride. T.J.'s "date" with Valas was her last as a prostitute because, shortly thereafter, her pimp "abused her," and she left.

A jury convicted Raymond Valas of sex trafficking of children in violation of 18 U.S.C. §§ 1591(a) & (b)(2) because he engaged in commercial sex acts with T.J., the minor victim, who was fifteen years old at the time. The district court sentenced Valas to fifteen years in prison and a subsequent fifteen years of supervised release. Valas timely appealed, raising seven arguments: (1) the district court improperly instructed the jury on § 1591's scienter requirement regarding the victim's age, resulting in a conviction based on a lower mental state than authorized by the statute; (2) the Government improperly disclosed impeachment evidence too late for Valas to use the evidence effectively at trial; (3) the district court erroneously refused Valas's request for an alibi jury instruction; (4) the district court erroneously refused Valas's request for a

No. 15-50176

spoliation jury instruction; (5) the district court erroneously allowed challenged rebuttal evidence; (6) prosecutors made improper comments during closing arguments; and (7) the cumulative effect of these six errors was so substantial that reversal is required. After oral argument and a review of the briefs and record, we AFFIRM.

## II. Discussion

### A. Scienter under 18 U.S.C. §1591

Valas first argues that the district court improperly charged his jury on 18 U.S.C. § 1591's scienter requirement regarding knowledge of the victim's age. The district court explained to the jury that it could convict Valas if it found, in relevant part, that

> T.J. had not attained the age of 18 years of age, and (1) the defendant *knew* T.J. had not attained the age of 18 years, or (2) the defendant *recklessly disregarded* the fact that T.J. had not attained the age of 18 years, or (3) the defendant had a *reasonable opportunity to observe* T.J. (emphasis added).

Valas argues that the district court erred because, under Valas's reading, the statute does not allow conviction under the "reasonable opportunity to observe" finding as to scienter. We addressed this issue thoroughly in a companion case, *United States v. Copeland*, ---F.3d---, 2016 WL 1741616 (5th Cir. May 2, 2016). Malcom Copeland, one of T.J.'s pimps, was also convicted by a jury of sex trafficking of children, including T.J., in violation of 18 U.S.C. § 1591. His jury was instructed in the same manner as Valas's. In *Copeland*, we held that that the district court properly instructed the jury on §1591's scienter requirements. So too, here.

### B. Late Disclosure of Evidence

After the Government rested its case-in-chief and before the defense case began, the Government provided defense counsel with nineteen photographs

4

from of one of T.J.'s cell phones. The photographs depicted T.J. around the time that she met Valas at his hotel room. T.J. was dressed and posing provocatively in several pictures; six were used in her Backpage.com profile, which the Government entered into evidence during its case-in-chief. The Government stipulated to the pictures' admissibility, and defense counsel stated that it planned to make them a defense exhibit. Defense counsel did not object. The next day, however, defense counsel objected to the pictures as "simple Rule 16 evidence,"[1] and moved for a mistrial because the Government did not timely turn over what defense counsel thought was "clearly exculpatory . . . impeachment evidence" under *Brady v. Maryland*, 373 U.S. 83 (1963). The district court confirmed that defense counsel planned to show the pictures to the jury to support its theory that T.J. "looked like she was 19" at the time she met Valas. The district court then overruled the objection and denied the motion for a mistrial.

We review de novo claims that the Government violated *Brady*, *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006), and for abuse of discretion a district court's denial of a motion for a mistrial, *United States v. Valles*, 484 F.3d 745, 756 (5th Cir. 2007).

"There are three components to a *Brady* violation. First, the evidence must be favorable to the accused, a standard that includes impeachment evidence. Second, the State must have suppressed the evidence. Third, the

---

[1] Federal Rule of Criminal Procedure 16 governs discovery. Subsection (a)(1)(E), Documents and Objects, states:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
> (i) the item is material to preparing the defense;
> (ii) the government intends to use the item in its case-in-chief at trial; or
> (iii) the item was obtained from or belongs to the defendant.

No. 15-50176

defendant must have been prejudiced." *United States v. Hughes,* 230 F.3d 815, 819 (5th Cir. 2000). Assuming without deciding that the Government suppressed evidence favorable to Valas, the defendant's argument fails because he cannot show prejudice. To establish prejudice, also called materiality in this context, *see id.*, Valas must show that the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). Valas already had six of the nineteen photographs, and our review confirms that none of the other thirteen was materially different. Further, our precedent is clear that "[i]f the defendant received the material in time to put it to effective use at trial, his conviction should not be reversed simply because it was not disclosed as early as it might have and, indeed, should have been." *United States v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985). Valas had every opportunity to use the photographs effectively at trial: (1) the Government offered and the district court agreed that Valas could recall any Government witness—including T.J., the victim—to cross-examine with the photographs, but Valas declined; (2) defense counsel showed the photographs to the jury and entered them into evidence; and (3) defense counsel discussed the pictures, again showing them to the jury, at length during closing arguments. Valas cannot show prejudice, and the alleged late disclosure did not result in "a fundamentally unfair trial." *Id.* at 1049. Because we find no *Brady* violation, the district court did not abuse its discretion in denying Valas's motion for a mistrial.

## C. Alibi Jury Instruction

Valas was charged with and convicted of having sexual relations with T.J. "on or about" August 26, 2013. The Government argued that the charge covered the extended sexual encounters with T.J., including both the night of

6

No. 15-50176

August 26 and the following night leading into the early morning hours of August 28.[2] Notably, Valas's alibi jury instruction argument pertains only to the first encounter, and even that only in part. Valas *admitted* meeting T.J. at his hotel room between 9:00 and 9:02 p.m. on the 26th, but testified that the encounter lasted less than thirty seconds. Valas testified that he left his hotel room to meet up with other military members for dinner "no more than two minutes after [this] encounter." Sergeant Major Jason Speltz, also of the New Hampshire National Guard, testified that the group "planned to meet in the hotel restaurant/bar at 9:00 p.m. that night," and that Valas "did that," staying until 10:30 p.m. Based primarily on Speltz's testimony, Valas requested the Fifth Circuit pattern alibi jury instruction as to his encounter with T.J. on August 26. The Government argued that because Valas admitted to meeting T.J. at his hotel room at 9:00 p.m.—the same place and time T.J. testified that she met Valas and performed sexual acts on him—the evidence did not support an alibi instruction. The district court recognized that this was a close issue, but denied the alibi jury instruction. On appeal, Valas argues that the denial of an alibi instruction prevented him from adequately presenting his defense.

We review a district court's denial of an alibi instruction for abuse of discretion. *United States v. Laury*, 49 F.3d 145, 152 (5th Cir. 1995). A "trial judge has substantial latitude in formulating the jury charge," *id*., and we will "reverse the district court's decision only if the requested instruction (1) was a

---

[2] We note that the indictment and the Government's "on or about" argument might have raised a duplicity concern. The Government offered proof at trial and argued that Valas committed two sexual assaults against T.J., but only charged him in a single count indictment, alleging that the commercial sex act occurred "on or about" August 26. Charging two or more distinct and separate offenses in a single count is generally "unacceptable because it prevents the jury from deciding guilt or innocence on each offense separately and may make it difficult to determine whether the conviction rested on only one of the offenses or both." Wayne R. LaFave et al., 5 Crim. Proc. § 19.3(d) (4th ed. 2015). However, Valas did not raise this issue on appeal, so it is waived. *See* Fed. R. App. P. 28(a); *Yohey v. Collins*, 985 F.2d 222, 224–25 (5th Cir. 1993).

substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense." *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011) (quoting *Cooper Indus., Inc. v. Tarmac Roofing Sys., Inc.*, 276 F.3d 704, 714 (5th Cir. 2002)). Finally, the denial of an alibi jury instruction is only reversible error "if the defendant was improperly denied an opportunity to convey his case to the jury." *Laury*, 49 F.3d at 152.

We find Valas's argument unpersuasive using our *Laury* precedent for two reasons. First, Valas testified that he did in fact meet T.J. at his hotel room on August 26 at 9:00 p.m.: the time and place that the victim testified she performed sexual acts on him. Valas's alibi would not have put him at a different place at the time of the alleged commercial sex act; at best, his claim is that he spent less than thirty seconds with T.J. that night, and then joined his colleagues for dinner in the hotel's restaurant/bar—a claim he and defense witnesses urged freely to the jury. Whether the jury believed the defendant or the victim was a credibility determination, and the law in this circuit is clear that "[i]t is exclusively the function of the jury to assess credibility." *United States v. Kimble*, 719 F.2d 1253, 1256 (5th Cir. 1983). Valas's reliance on *United States v. Menga*, 450 F.2d 511 (5th Cir. 1971) is misplaced. There, the district court refused to provide an alibi instruction despite: (1) the fact that there was no direct evidence placing the defendant at or near the location of the burglary on the night in question; (2) two witnesses testified in detail that the defendant was many miles from the location of the burglary "during the hours when the burglary could have been committed"; and (3) the alibi was the defendant's only defense. *Id.* at 512–13. None of those factors is present in Valas's case. First, Valas admitted to meeting the victim at the same time and place that she alleged the sexual acts occurred. Second, Valas's "alibi" was not

his only defense. He also insisted that he met with T.J.—at his hotel room, twice—but only to "interview" her. *Menga* does not control, therefore.

Second, relatedly, Valas was able to "convey his case to the jury," including his argument that he had an alibi for an extended encounter on August 26. *Laury*, 49 F.3d at 152. In *Laury*, the district court refused the defendant's request for a jury instruction, but did "instruct the jury that the jury was required to weigh the evidence and judge the credibility of the witnesses." *Id*. And the defendant was able to argue his alibi to the jury during closing arguments. *Id*. This court held that "[t]he general jury instruction, taken with Laury's closing argument, was sufficient to place the alibi defense before the jury, and the district court did not commit reversible error by failing to give the requested instruction." *Id*. We hold the same to be true in the instant case. The district court instructed the jury that it was required to weigh evidence and judge the credibility of the witnesses, and Valas was able to present his straightforward alibi claim against extended time with T.J. during his case-in-chief and again, forcefully, in closing arguments. We conclude that the district court did not reversibly err by denying Valas's request for a jury instruction.

## D. Spoliation Jury Instruction

Agents confiscated Valas's BlackBerry when he was arrested. Valas provided the BlackBerry's password at the time of arrest, but the password expired, "locking out" the phone before the Government could recover its contents. At a status conference on July 1, six weeks after Valas's arrest, the Government told opposing counsel and the district court that it could not access Valas's phone, and stated that if Valas would provide the password, it would speed things up. The record does not indicate whether Valas provided his password at or around the July 1 hearing. An attempt by the National Guard

to reset Valas's password failed. Despite efforts by federal agents at the crime lab in Quantico, no one could access the locked phone due to its encryption software. Ultimately, all data on the phone was destroyed when a Quantico technician attempted to access the data by removing the phone's chip. The Government gave to defense counsel all information from the phone acquired from the service provider.

Valas asked for a spoliation jury instruction, arguing that the Government should have alerted defense counsel and the district court if it thought that that evidence on the phone was going to be destroyed in testing. The Government objected, arguing that a spoliation instruction requires a finding of bad faith, which the defense had not shown. The district court denied the jury instruction. This court reviews for abuse of discretion a district court's denial of a spoliation jury instruction. *See United States v. Wise,* 221 F.3d 140, 156 (5th Cir. 2000). To receive a spoliation jury instruction, the party seeking the instruction must demonstrate bad faith or bad conduct by the other party. *See id.* Valas has not shown that the Government acted in bad faith. While it is true that Valas provided his password to his arresting officers, prosecutors did not have the password at a status conference six weeks later. The Government asked defense counsel for the password at that time, but the record does not indicate whether Valas provided it. Without the password, the Government tried to access the BlackBerry in several different ways, but was ultimately unsuccessful. Valas has not shown that the Government's actions rose to the level of bad faith, and the district court did not abuse its discretion in denying his request for a spoliation instruction.

*E. Admissibility of Rebuttal Evidence*

Valas next argues that the district court erred by allowing the following evidence: (1) extrinsic act evidence consisting of six Backpage.com ads for

10

women other than T.J. and Valas's phone records showing his text messages and calls to the numbers in these ads; (2) a Department of Defense training program on human trafficking; and (3) the testimony of three witnesses called on rebuttal to discuss the rules and research protocols at the Army War College (the military school through which Valas was enrolled at Syracuse University).

This court reviews preserved objections to evidentiary rulings for abuse of discretion, subject to the harmless error standard. *United States v. El-Mezain*, 664 F.3d 467, 494, 525–26 (5th Cir. 2011). Non-preserved evidentiary issues are reviewed for plain error. *United States v. Richard*, 775 F.3d 287, 295 (5th Cir. 2014). District courts have "broad discretion over the admissibility of evidence, 'including its relevance, probative value, and prejudicial effect.'" *United States v. Parziale*, 947 F.2d 123, 129 (5th Cir. 1991) (quoting *United States v. Prati*, 861 F.2d 82, 86 (5th Cir. 1988)). "[F]or any of the evidentiary rulings to be reversible error, the admission of the evidence in question must have substantially prejudiced [the defendant's] rights." *United States v. Sanders*, 343 F.3d 511, 519 (5th Cir. 2003). The Federal Rules of Evidence grant the district court the discretion to control the mode and order of interrogating witnesses. Fed. R. Evid. 611(a). "This grant of discretion includes broad authority to control the scope of rebuttal." *United States v. Sanchez*, 988 F.2d 1384, 1393 (5th Cir. 1993).

1. Extrinsic Act Evidence

The Government introduced six Backpage.com ads depicting women other than T.J. in suggestive attire—the ads suggested "escort" services. The Government also introduced phone records indicating that Valas contacted or attempted to contact the women in these ads. Valas's counsel objected that the evidence was substantially more prejudicial than probative; the district court overruled this objection. The Government argues that Valas did not sufficiently object that the pictures were improperly admitted as extrinsic act

evidence in violation of Federal Rule of Evidence 404(b). Thus, the Government urges us to apply plain error review. Valas, however, argues that we should apply a heightened abuse-of-discretion standard. We decide that we "need not resolve which standard is appropriate because [. . .] the evidence was properly admitted as relevant to an issue other than his character." *United States v. Williams*, 620 F.3d 483, 489 (5th Cir. 2010).

The Government referred to the prostitution ads and Valas's messages to the women primarily during closing arguments, stating: "Then we looked at all of the prostitution ads and text messages to other females – I think there's more than ten – during an expansive period of time that shows that this man intended what he was doing and had the opportunity to know what he was doing." Valas testified at trial that he met T.J. only to "interview" her as part of scholarly research. The Government argues, and Valas does not dispute, that the additional Backpage.com ads and the corresponding phone records show that he repeatedly called prostitutes outside of the time he spent in his Army War College program—both before beginning and after turning in his final paper. The fact that Valas responded to these ads and contacted these other women, the Government states, showed his intent and his state of mind, both permissible uses under Rule 404(b), rather than his bad character. We agree. Added to the fact that Valas admitted to never successfully "interviewing" a prostitute for his field research, this evidence plausibly showed Valas's intent to meet prostitutes for sexual encounters. Finally, because Valas testified, his character for truthfulness was a permissible subject. *See United States v. Waldrip*, 981 F.2d 799, 803 (5th Cir. 1993). Introducing evidence that Valas contacted prostitutes outside of his Army War College timeframe casts doubt on Valas's testimony that he was only interviewing T.J. Thus, these ads were permissible under Rule 404(b).

No. 15-50176

Valas's further argument that the ads were substantially more prejudicial than probative also fails. Notably, the district court mitigated any prejudicial effect by giving a limiting instruction.[3] This court has previously held that, "[u]nder the Rule 403 standard, when the court issues a limiting instruction, it minimizes the danger of undue prejudice." *Sanders*, 343 F.3d at 518. The district court did not err by admitting this evidence.

2. Human Trafficking Presentation

During the cross examination of Valas, the Government introduced PowerPoint slides from a Department of Defense training program on human trafficking. The Government used these slides during the defense case and during rebuttal, posing questions to witnesses and reading parts of the slides. Defense counsel objected to the slides twice:  first, he objected during the cross examination of Valas because Valas could not identify the slides and defense counsel did not have time to review them. Defense counsel objected a second time after Valas finished his testimony, on the same grounds:  that, because Valas was "not even sure that he'd seen or, rather, he'd done; that it's an ambush." Valas's counsel moved for a mistrial. The district court judge overruled both objections and denied the motion for a mistrial. On appeal, Valas argues that the slides were both irrelevant under Federal Rule of Evidence 401 and confusing and misleading under Rule 403. Valas did not make either of these objections in the district court, so we review for plain error. *See Williams*, 620 F.3d at 488–89.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Valas's defense was based upon his contention that he was only "interviewing" T.J., and that he did not have

---

[3] The district court provided the pattern Fifth Circuit similar acts jury instruction.

sexual relations with her. Valas admitted "in hindsight" that it was not "a sharp idea for [him] to meet in [his] hotel room with a prostitute, even if she billed herself as 19 years old." He claimed naiveté. Yet he admitted to taking human trafficking training annually. We agree that these slides cast doubt on Valas's defense because, as a Lieutenant Colonel in the United States Army, he was trained on human trafficking:  its signs, dangers, and horrors. The slides make it more probable that Valas called T.J. for sexual relations, because a career Army officer who takes annual human trafficking awareness training is informed not to invite a prostitute into his private hotel room for an "interview." Hence, the slides cut against Valas's claim that his actions were the result of naiveté.

Even if relevant, Valas argues, the slides were put to an "unfair and misleading use" because the "prosecutor repeatedly read slides from the program, or quoted it as authority, to suggest that witnesses should be familiar with the dictates in the particular slides." Valas does not cite any authority for his claim that the Government's actions were unfair or misleading. Valas admitted to taking "Combating Trafficking in Persons" training annually, but he did not remember if the PowerPoint training in question was the exact training he took, although he said that it "sounds right." Several other military witnesses testified to their familiarity with the exhibit and with human trafficking training. Even if these were not the exact slides that Valas trained on, they at a minimum alerted the jury to the type of training Valas would have experienced. Valas has not shown how these slides would confuse or mislead the jury, and the district court did not err in admitting them as contradiction and credibility evidence.

3. Rebuttal Witnesses

Valas's final evidentiary argument is that the district court erred by allowing the Government to call three witnesses from the Army War College

on rebuttal:  Randy White, Phil Evans, and Tom Williams. On appeal, Valas claims that the testimony of all three witnesses was irrelevant, and that the testimony of Williams was cumulative. At trial, defense counsel objected after White and Evans testified but before Williams did on grounds that Williams's testimony was going to be cumulative and not proper rebuttal testimony. Valas also raised a relevancy objection during William's testimony, but not before. Therefore, his cumulative and relevancy claims for Tom Williams are reviewed for abuse of discretion, and his cumulative and relevancy claims for Randy White and Phil Evans are reviewed for plain error. *See Richard*, 775 F.3d at 295.

Valas's testimony at trial clearly linked his time at the Army War College with his alleged prostitution research, claiming that he called T.J. to "interview" her, not to have sexual relations with her. At best, Valas was unclear about the distinction between his "official" Army War College research and his "unofficial" or independent research.[4] The three witnesses Valas objects to were called on rebuttal to refute Valas's claim that he was conducting research into prostitution and only "interviewed" T.J. These witnesses described the Army War College rules and procedures—including the procedures one must follow in order to conduct in-person interviews—and explained that Valas's "research" and his alleged "interview" with T.J. violated these rules and procedures. This testimony was relevant.

---

[4] Valas urged to the jury as well as to us that his prostitution "research" was tied to his Army War College experience:

> His [Army War College] paper focused on law enforcement; his greater interest lay in reconciliation, with learning how to incentivize participants to leave crime behind. His trips to El Salvador had led Valas to think that low-level drug traffickers and prostitutes were trapped in a self-perpetuating system. Because it was impossible to call drug transporters and ask to talk to them, Valas decided to call escort services to learn as much as he could about the people in the business and to formulate ideas about how to help people out.

Valas also claims that William's testimony was cumulative, but he cannot show an abuse of discretion. Williams's testimony focused almost exclusively on the Army War College's human protection protocols—specifically, the rules and procedures surrounding an Army War College fellow conducting personal interviews with human subjects (such as a prostitute). White and Evans spoke about Valas's Army War College project generally. While there was certainly some overlap, this court has previously held that district courts have "broad authority to control the scope of rebuttal." *Sanchez*, 988 F.2d at 1393. And even if the district court erred, for any evidentiary ruling to be *reversible* error, "the admission of the evidence in question must have substantially prejudiced [Valas's] rights." *Sanders*, 343 F.3d at 519. Valas has not shown any "prejudice to his rights" from the admission of William's testimony.

## F. Government Statements During Closing Arguments

Valas argues that several of the Government's statements in closing argument were inappropriate and warrant vacation of his conviction. Valas objected to only two of the alleged improper statements during trial. We review the preserved issues for abuse of discretion, *see United States v. Griffin*, 324 F.3d 330, 361 (5th Cir. 2003), and the unpreserved issues for plain error. *United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009). "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone," and "[t]he determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989). "A prosecutor's argument is reversible error only when so improper as to affect a defendant's substantial rights." *United States v. Vaccaro*, 115 F.3d 1211, 1215 (5th Cir. 1997).

No. 15-50176

Valas's claims of improper prosecutorial statements fall into four general categories: (1) comments that mischaracterize the jury's role; (2) comments that impugn defense counsel; (3) comments that went outside of the evidence presented at trial; and (4) comments that shifted the Government's burden of proof onto the defendant.

1. Mischaracterizing the Jury's Role

Valas argues that several of the prosecutor's remarks during closing arguments mischaracterized the jury's role, asking the jury to "protect children" and "decide the case on social concerns rather than on the evidence." First, he takes issue with the Government telling the jury that Valas was "gambling on the notion that folks like us, folks like you and our justice system doesn't care about children like [T.J.]," explaining that human trafficking laws are there "to protect children just like [T.J.]," and asking the jury "to protect [T.J.] and send a message and convict Raymond Valas for sex trafficking of a minor." A review of the record shows that these statements were made in response to defense counsel's frequent claims that T.J. had a poor reputation and poor character. During his cross examination of T.J., for example, Valas's counsel elicited or attempted to elicit that T.J. (1) had been on probation; (2) had used and/or abused drugs and alcohol; (3) had a physical altercation with her mother; (4) took her mother's debit or gift card; (5) had been in trouble at school and elsewhere; (6) tried to commit suicide at least three times; (7) had stayed with different male friends on several occasions; and (8) had previously had sex with someone. The attacks on T.J.'s character continued during Valas's case-in-chief, when he called three different witnesses to testify to T.J.'s character and reputation.

It is with this background that the prosecutors emphasized whether jurors could believe T.J., culminating in the above statements. Viewed in context, the statements that the defense complains about (1) go to T.J.'s

17

credibility; (2) ask the jury to return a guilty verdict; and (3) ask the jury to serve as the community's conscience. All three are permissible under this court's precedent. *See Kimble*, 719 F.2d at 1256 ("It is exclusively the function of the jury to assess credibility."); *United States v. Ruiz*, 987 F.2d 243, 249 (5th Cir. 1993) (prosecutor's statements that are "merely a plea to the jury to do its duty" are not error); *United States v. Brown*, 887 F.2d 537, 542 (5th Cir. 1989) ("[U]nless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible." (quoting *United States v. Phillips*, 664 F.2d 971, 1030 (5th Cir.1981)). Valas has not shown plain error.

Valas's second alleged instance of mischaracterizing the jury's role is based on the underlined portions of the following paragraph:

> <u>Don't hold it against [T.J.]</u> that she had to put on the long hair and the braids and the jewelry; that she couldn't go looking like that; that she had to knock on the door of a strange hotel room to be met at the door by a strange man in nothing but a towel. Don't hold it against her. She was the supply. <u>Hold it against him because he was the demand</u>.

This statement was made in rebuttal in response to Valas's closing argument, in which defense counsel told the jury that "[T.J.] was in the game, you know, at large, away from home, doing drugs, dressing up, as the prosecutor said, pretending to be over 18 years old, in every way possible pretending, sexually, with drugs, with dress-up, with all those other things." Valas's counsel also commented on T.J.'s physical appearance when she met Valas at his hotel, which, he argued, was very different than T.J.'s appearance in court.

This court previously found no error when "defense counsel invited [a] response when he challenged the jury to compare [the defendant], as he looked in the courtroom, to the photographs." *United States v. Murphy*, 996 F.2d 94, 98 (5th Cir. 1993). As in *Murphy*, Valas "invited" the prosecutor to respond by

talking at length about T.J.'s physical appearance. It is a reasonable inference that a prostitute would dress in a particular manner to appeal to clients, and a prosecutor is permitted to make "reasonable inferences or conclusions that can be drawn from [properly admitted] evidence." *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008). Allowing these statements was not plain error.

Valas's third complaint is that the prosecutor used "sympathy and passion in deciding the case, rather than evidence," based on this closing argument statement, "[i]t's about what he put her through. It's about the fact that but for August 26th and 27th, she wouldn't have had to miss school and testify," and a passage that the prosecutor read to the jury from T.J.'s diary, which was previously admitted into evidence. First, Valas does not explain how the fact that T.J. had to miss school would inflame the jury's sympathy and passion, and it is a stretch to think that—in a case about alleged sex trafficking in children—the jury would become sympathetic or passionate about a child missing a day of school and then hold that against the defendant. Valas has not shown error. Second, T.J.'s diary was already in evidence when the prosecutor read from it, and a prosecutor is permitted in closing arguments to discuss properly admitted evidence. *Vargas*, 580 F.3d at 278. The passage at issue is a poem T.J. wrote allegedly about her experience as a prostitute.[5] The prosecutor used that passage to remind the jury why they were there. Valas

---

[5] The passage from T.J.'s diary reads:

I'm too young for this sh--. Why did he have to do that to me? I'm too young for this sh--. Is every man the same? Now everyone will just see me as a ho. No, I didn't want to. I had to. My life is on the line. He drugged me up. The pain, it hurts, the shallow. He will kill me. I couldn't tell – I couldn't tell. Lose my life over this? I'm too young for this sh--. I feel dirty. What if I had gotten pregnant? Excuse after excuse. What the f---. I can't let that go. You want me to forgive this bastard? He hurt me. You don't understand the pain and the scars because you haven't been in my shoes. F---, I'm just too young for this sh--. My life is crumbling away so fast. Damn, I'm too young for this sh--.

argues on appeal that this particular passage from T.J.'s journal was not linked to him, but he did not object to the diary at the time it was entered nor did he object during closing arguments. "That the defendants disliked the facts that the Government chose to highlight, or the inferential gloss that the Government chose to put on those facts, cannot be a ground for reversal, in light of attorneys' 'wide latitude' in crafting their closing arguments." *United States v. Reagan*, 725 F.3d 471, 493 (5th Cir. 2013) (quoting *United States v. Rodriguez*, 43 F.3d 117, 123 (5th Cir. 1995)). The jury in this case was asked to determine whether Valas was involved in sex trafficking of a minor by deciding whether Valas did or did not have sexual relations with T.J. Both Valas and T.J. testified, and it was up to the jury to determine their credibility. *See Kimble*, 719 F.2d at 1256. T.J.'s journal entry reflected her experience as a prostitute—an experience that she testified about. Valas has not shown that the district court plainly erred by allowing the prosecutor to read from T.J.'s journal.

2. Impugning the Defense Attorney

Valas argues that two sets of comments during closing arguments were inappropriate because they were "calculated to impugn the defense lawyer and to strike at Valas for his exercise of his rights to counsel and trial." First, the defense objects to the prosecution's characterization that the defendant was trying to muddle the issues by analogizing to a child kicking her feet on a beach, and how "everything gets real murky, real muddy, and [she] can't see what's going on. . . . The defendant's been kicking his feet around all week." Prosecutors continued this analogy twice more during closing arguments. Valas points to this court's opinion in *Vaccaro*, 115 F.3d at 1218, which found that "[t]he prosecutor's statement that defense lawyers 'muddle the issues' was clearly improper." *Vaccaro* is distinguishable, however. In that case, the prosecutor was clearly talking about the defense attorney "muddling the

issues," and the court found it was improper because the prosecutor "was seeking to 'draw the cloak of righteousness around the prosecutor in his personal status as government attorney and impugn[] the integrity of defense counsel.'" *Id.* (alteration in original) (quoting *United States v. Frascone*, 747 F.2d 953, 957–58 (5th Cir. 1984)). Here, the prosecutors focused on Valas himself "muddying the waters," and Valas testified at trial. Whether the defendant's own testimony "muddled the issues" goes to his credibility, a jury determination. *See Kimble*, 719 F.2d at 1256. Valas has not shown that this statement was "so improper as to affect [his] substantial rights." *Vaccaro*, 115 F.3d at 1215.

Valas next appeals this Government rebuttal statement: "Several times during [defense counsel's] statement he said to you: The government wants you to believe blah, blah, blah, whatever he said." While Valas argues again that this was "calculated to impugn the defense lawyer," the Government counters that it was about "mischaracterizations defense counsel made about the government's case." The Government argues that "blah, blah, blah could have been replaced by 'x, y, z' or 'this and that,'" and points out that "Valas has cited no authority suggesting that the prosecutor had to repeat the defense counsel's mischaracterization word for word."

Because Valas did not object, this court reviews for plain error. The prosecutor's comment was inappropriate—at the very least, it is unprofessional to summarize an opponent's argument with "blah, blah, blah," which is substantially more dismissive that "x, y, z" or "this and that." And while this court has repeatedly held that "[n]o prosecutor, however, may impugn the integrity of a particular lawyer or that of lawyers in general, without basis in fact, as a means of imputing guilt to a defendant," *United States v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980), Valas cites no authority indicating that this sort of dismissive effort to characterize attorney argument

rises to plain error. Even though unprofessional, the statement was not reversible error because it was not "so improper as to affect [Valas's] substantial rights." *Vaccaro*, 115 F.3d at 1215.

3. Comments Outside of the Evidence

Valas next challenges two statements made during the Government's closing argument as outside of the evidence presented at trial. First, Valas questions the underlined portion of the following paragraph:

> You might be thinking, well, what about the sergeant major who said he came downstairs? Yeah, what about that? They're all hanging out at the bar. <u>What better cover for your moment to have a prostitute come to your room than while all the guys are down at the bar. Who's going to question if the colonel's running late?</u> Because we know [T.J.] went to that hotel.

This statement, however, described admitted evidence and reasonable inferences drawn from that admitted evidence, which is permissible. *See Mendoza*, 522 F.3d at 491. Sergeant Major Speltz testified that he met Valas in the "hotel restaurant/bar at 9:00." Valas testified that he met T.J. "no more than two minutes after 9:00 . . . and [he] was already wanting to be downstairs." And T.J. testified that Valas paid her for sexual activity around 9:00 p.m. Therefore, the Government's statement accurately reflected the evidence and drew a reasonable inference from that evidence:  namely, that Valas showed up for dinner later than precisely 9:00 p.m. Valas has not shown that the district court plainly erred.

Second, Valas contests Government comments to the jury about his missing BlackBerry. The Government stated that the BlackBerry "would not show a message that says to prostitutes, 'This is Raymond Valas. I'm a researcher, and I want to interview you.'" The defense counsel objected, arguing that this statement was improper because no one knew what was actually on the damaged BlackBerry. The district court overruled the objection,

stating that the "jury will be the sole judges of what the evidence shows or does not show." Because defense counsel objected contemporaneously, this court reviews for abuse of discretion. *See Griffin*, 324 F.3d at 361. The comments in question were from the Government's rebuttal, and were a direct response to a statement defense counsel made to the jury:

> Because now the prosecutor will tell you, I wish I had [the defendant's BlackBerry], too. My goodness, I wish that it wasn't broken that way, and I didn't – I had all that information, too. Folks, it doesn't work that way, and you shouldn't let it work that way. You should not let it work that way, to the detriment of this man.

The defense initially brought up Valas's BlackBerry and even suggested to the jury what the prosecutor might say. The prosecution responded, based on evidence elicited during Valas's testimony that he was a writer, not a researcher. Thus, based on Valas's own statements, the prosecutor suggested the inference that there would not be a message from Valas to T.J. telling her that he was a researcher. *Mendoza*, 522 F.3d at 491. Valas asks us to apply *United States v. Murrah*, in which this court held that "[a] prosecutor may not directly refer to or even allude to evidence that was not adduced at trial." 888 F.2d 24, 26 (5th Cir. 1989). *Murrah* is distinguishable. In that case, the prosecutor in closing arguments accused the defendant and his attorney of hiding an investigator, even though "[t]he trial record reflect[ed] that there was no evidence whatever [sic] to support the suggestion that a witness had been hidden." *Id*. Here, the defendant himself spent a significant amount of time discussing his communications with different prostitutes, and on at least three occasions discussed whether he introduced himself as a researcher when contacting prostitutes:  twice he stated that he did, and once—when he contacted T.J.—he stated that he did not. Valas has not shown that the district court abused its discretion in allowing the statement, nor can he show that this

statement "affect[ed] [his] substantial rights." *Vaccaro*, 115 F.3d at 1215. The district court, which did remind the jury that attorney argument is not evidence, did not reversibly err.

4. Shifting the Government's Burden of Proof

Next, Valas argues that the Government made two statements during rebuttal that improperly shifted the Government's burden of proof onto the defendant. The statements in question are underlined in the passages below:

> **Government:** Colonel White told you that he sat with him and reviewed what his research was. He put him in contact with experts in his field. Not one time did they ever discuss prostitution or human trafficking. Is it reasonable or ridiculous that what he was doing was a part of research? It absolutely was not.
>
> Did they bring you a single person from Syracuse University to say otherwise?
>
> **Defense Counsel**: I'm going to object to shifting the burden of proof and persuasion.
>
> **The Court**: Sustained. Sustained.
>
> **Defense Counsel**: Ask for an instruction and a mistrial.
>
> **The Court**: Jury's instructed to disregard the last statement of the – of Ms. Richardson. And the motion for mistrial is denied.
>
> **Government**: Is there a single piece of paper before you that shows any evidence that he was researching prostitution for human trafficking?

The district court found that the first comment improperly shifted the Government's burden, sustaining Valas's objection. If a prosecutor "ma[kes] an improper remark, [this] court considers three factors in determining whether the misconduct constitutes reversible error: '(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction.'" *United States v. Salcido*, 342 F. App'x 976, 978 (5th Cir. 2009)

(unpublished) (quoting *United States v. Hernandez-Guevara*, 162 F.3d 863, 874 (5th Cir. 1998)). The district court sustained Valas's burden-shifting objection, instructed the jury to disregard it, and determined that a mistrial was not appropriate. This court "affords considerable weight to the district court's 'on-the-scene assessment of the prejudicial effect.'" *Id.* (quoting *United States v. Fields*, 72 F.3d 1200, 1207 (5th Cir. 1996)). The district court was in the best position to determine the statement's prejudicial effect and elected to issue a curative instruction. We find that any prejudicial effect was mitigated by the district court's response.

Valas did not object to the Government's second rhetorical question, so we review for plain error. *See Richard*, 775 F.3d at 295. Valas has not demonstrated how this comment prejudiced him, hence he cannot show that this statement was plain error or affected his substantial rights. *See Vaccaro*, 115 F.3d at 1215.

Valas has not shown any of the Government's closing argument statements to be reversible error. *See Vaccaro*, 115 F.3d at 1215.

## G. Cumulative Error

Valas's final argument is that "this is one of those rare cases in which cumulative-error analysis should apply," because "[t]he numerous errors synergistically and fatally infected the trial and rendered it fundamentally unfair." Here, Valas has not shown that the district court erred, and where the appellant "has not established any error . . . there is nothing to cumulate." *United States v. Alaniz*, 726 F.3d 586, 628 (5th Cir. 2013) (quoting *United States v. McIntosh*, 280 F.3d 479, 484 (5th Cir. 2002)).

## III. Conclusion

For the foregoing reasons, we AFFIRM.