# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 22, 2021

Lyle W. Cayce
Clerk

No. 20-20116

United States of America,

*Plaintiff—Appellee*,

*versus*

Clarence Tramiel Beard,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CR-601-1

Before Davis, Elrod, and Oldham, *Circuit Judges*.
W. Eugene Davis, *Circuit Judge*:

Clarence Tramiel Beard appeals the district court's denial of his motion to suppress drugs found in a package he mailed via the United States Postal Service from Houston, Texas, to Hammond, Louisiana. Beard does not dispute that reasonable suspicion existed to detain the package when it arrived in Hammond. He argues that his Fourth Amendment rights were violated, and an unlawful seizure occurred, when the package was rerouted back to Houston, which took five days, before law enforcement took further

No. 20-20116

investigative steps to confirm their suspicion. Beard argues that the drugs discovered in the package consequently should have been suppressed. As set forth below, the district court did not err in denying Beard's motion to suppress; therefore, we AFFIRM.

## I.

During the suppression hearing conducted by the district court, deputy United States Marshal Jeffery Gordon testified as follows. In January 2018, Gordon worked as a narcotics investigator for the United States Postal Inspection Service (USPIS). He was working with Homeland Security Investigations (HSI) to combat the opioid epidemic in the Houston area. Prior to January 2018, Gordon was investigating Beard for sending pills in the mail. During that time, Gordon learned that Beard had used the alias "Nick Johnson" to mail packages. Additionally, several individuals had been arrested for drug possession in Amarillo, Texas, and those individuals had identified Beard as the one who supplied them with drugs through the mail.

In late November 2017, Gordon put an alert on the address of Kelly McAllister in Hammond, Louisiana, after learning that McAllister had wired "numerous structured payments of $1,000" to Beard. Gordon was suspicious that Beard was "mailing manufactured pills to Hammond" and that McAllister was wiring payments back to Beard. Because of the alert, Gordon would be notified if any packages were mailed to McAllister's address.

Gordon received an automated alert on January 8, 2018, that a package had been mailed to McAllister's address in Hammond. Gordon viewed a photograph of the package and its label in a postal database. The package had characteristics common to narcotics trafficking generally and some characteristics that were specific to Beard's suspected drug activity. It had a handwritten label, as opposed to the type of professional printed label used

by businesses, and it was mailed from a post office in Houston "that [Beard] frequented." Moreover, the sender's name was "Nick Johnson," and the return address was fake. Finally, the package was addressed to McAllister, who had been making $1,000 wire transfers to Beard. For all of those reasons, Gordon wanted to investigate the package further, and he believed he had reasonable suspicion to detain it.

On the same day he received the alert (January 8), Gordon submitted a request that the package be pulled from the mail stream. It was impossible, however, to stop the package before it arrived in Hammond because there was "no telling where in the mail stream it [wa]s." A report indicated that the package arrived in Hammond three days later, on January 11, 2018.

When Gordon learned that the package arrived in Hammond, he called the post office there and asked that the package be located and "pull[ed]." The package was pulled and then mailed back to Houston within 24 hours, either on January 11 or 12. When mailing packages back to USPIS in Houston, the postal employees "typically [would] try to mail them Express Mail." Though Gordon could not require that the package be sent overnight, he expected the package to return to Houston "within a day or two."

Gordon explained that he chose to reroute the package rather than request a canine sniff in Hammond because he thought the process would have been delayed even more by "getting people from New Orleans, or wherever it may be, to go to Hammond, get the box, get up to speed, and get a dog hit on it." He stated: "It's—it was six one way, half-a-dozen the other to us. So having it—having it mailed back to me and being able to get the warrant within a day is—is—was our decision." Gordon, however, acknowledged on cross-examination that he could have driven approximately five or six hours to Hammond himself to oversee a canine sniff there. But if the canine search had been conducted in Hammond, and the dog alerted,

then a different inspector and Assistant United States Attorney (AUSA) probably would have had to become involved in the case in order to obtain a search warrant.

The decision also was made to send the package back to Houston because USPIS and HSI had a relationship with a lab in Houston where the package would be prioritized and safely screened for opioids and opioid derivatives. At the time, those drugs "were not testable in the field." Therefore, if the package had been opened in Hammond, it would have to have been sent back to Houston for testing.

Although Gordon expected the package to take one or two days to return to Houston, the package took five days. Gordon testified that the timing of the delivery was "out of [his] control" and that he did not know why the package took so long. He received the package on the afternoon of January 17, 2018.

Gordon examined the outside of the package to see if it had other suspicious characteristics. He manipulated it and found that it seemed to contain "two separate, dense masses" that had "a soft feel" that mimicked bags of powder. Gordon arranged for a canine inspection as quickly as possible, which was "first thing the next morning."

A canine inspection was performed, and the dog alerted to the subject package. Gordon then completed a search warrant application, obtained approval from the AUSA, and presented the warrant application to the court as quickly as he was able to see the judge, which was the next morning, on January 19, 2018. Thus, Gordon obtained a search warrant within 48 hours of receiving the package.

The district court determined that the package was seized on January 11, 2018, "when it was pulled from the normal stream of mail into which Beard had placed it" and that the seizure was supported at its outset

by reasonable suspicion. The district court noted that the five-day return trip back to Houston "was over a weekend and that it did not involve any lack of diligence on behalf of law enforcement." The court noted Gordon's testimony that he "expected the parcel would be returned within one to two days, rather than the five days it actually took." Furthermore, once the package arrived in Houston, "law enforcement acted quickly."

The court determined that it was "neither negligence nor unreasonable conduct" for a postal inspector to ask that a mailed packaged be mailed back. The court concluded that, while the investigatory delay was somewhat lengthier than anyone anticipated due to the mail service, it was not unreasonable. It therefore denied Beard's motion to suppress. Beard conditionally pleaded guilty to possession with intent to distribute a controlled substance, reserving his right to appeal the district court's ruling on his motion to suppress, and was sentenced. He timely appealed.

## II.

On appeal, Beard concedes that the initial detention of the package in Hammond was lawful because it was supported by reasonable suspicion. He argues, however, that the detention of the package became an unreasonable seizure when it was rerouted back to Houston, which took five days, before further investigative steps to confirm reasonable suspicion were taken. Specifically, Beard argues that law enforcement unreasonably delayed their investigation because a canine sniff could have been conducted in Hammond and that the delay in determining probable cause consequently would have been substantially minimized.

When reviewing a ruling on a motion to suppress, this court reviews the district court's factual findings for clear error and its legal conclusions de

novo.[1] The evidence is viewed in the light most favorable to the prevailing party, here the Government.[2]

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[3] As explained by the Supreme Court, "[t]his text protects two types of expectations, one involving 'searches,' the other 'seizures.'"[4] "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."[5] "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."[6]

The protections of the Fourth Amendment extend to packages sent via the Unites States Postal Service.[7] Specifically, while in the mail, a package can be searched, i.e., opened and the contents examined, lawfully only if a search warrant is obtained.[8] With respect to the seizure of a package, in *United States v. Van Leeuwen*, the Supreme Court, relying on the principles set forth in *Terry v. Ohio*,[9] held that if the Government has reasonable suspicion that a package contains contraband or evidence of criminal activity, the package may be detained without a warrant while an investigation is

---

[1] *United States v. Glenn*, 935 F.3d 313, 320 (5th Cir. 2019).

[2] *Id.*

[3] U.S. Const. amend. IV.

[4] *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

[5] *Id.* (citations omitted).

[6] *Id.* (citations omitted).

[7] *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970).

[8] *Id.* (internal quotation marks and citation omitted).

[9] 392 U.S. 1 (1968).

conducted.[10] The Court stated, however, that "detention of mail could at some point become an unreasonable seizure of 'papers' or 'effects' within the meaning of the Fourth Amendment."[11]

The Court did not adopt a bright-line rule regarding how long a package could be detained lawfully prior to obtaining a search warrant. It stated that it was "only hold[ing] on the facts of this case . . . a 29-hour delay between the mailings and the service of the warrant [could] not be said to be 'unreasonable' within the meaning of the Fourth Amendment."[12] Moreover, the Court stated that "[t]he significant Fourth Amendment interest was in the *privacy* of th[e] first-class mail; and that privacy was not disturbed or invaded until the approval of the magistrate [for a search warrant] was obtained."[13]

This Court has little precedent determining the reasonableness of the detention of a package under *Van Leeuwen*.[14] In other circuit decisions that have addressed this issue, the relevant factors to consider in determining reasonableness include: investigatory diligence, the length of the detention,

---

[10] *Van Leeuwen*, 397 U.S. at 252.

[11] *Id.*

[12] *Id.* at 253.

[13] *Id.* (emphasis added).

[14] *See United States v. Jones*, 833 F. App'x 528, 532, 536-38 (5th Cir. 2020) (holding that reasonable suspicion supported detention of two packages, and defendant did not challenge reasonableness of two-day detention) (unpublished); *United States v. Daniel*, 982 F.2d 146, 149-50 (5th Cir. 1993) (holding that seizure of package from airline was supported by reasonable suspicion, and defendant did not challenge reasonableness of 45-minute detention).

No. 20-20116

and whether there were circumstances beyond the investigator's control.[15] Importantly, and as emphasized by the Court in *Van Leeuwen*, these factors are always considered in the context of the specific facts of the case under review.

In *United States v. Gill*, a decision from the Ninth Circuit, the defendant argued that too much time—six days—elapsed between the initial detention of a package and its subsequent search.[16] The package was mailed on a Thursday, detained the same day, and then rerouted to a destination near the recipient's address. The package, however, was not opened until almost a week later, on the following Wednesday, after a search warrant was obtained.[17]

The Ninth Circuit determined that the six-day delay between the detention of the package and its search was reasonable based on the specific facts of the case. The court noted that postal officers were diligent in their investigation of the package, but they encountered some delays due to the different schedules of other individuals needed for the investigation. For example, the postal employee charged with delivering the mail to the recipient's address did not work on Fridays and could not be contacted until Monday; the AUSA could not review the search warrant application until over the weekend; and the magistrate judge was not available to issue a warrant until Wednesday. The court noted that, contrary to the defendant's contentions, the investigation was not conducted at a "leisurely pace" and,

---

[15] *See United States v. LaFrance*, 879 F.2d 1, 7 (1st Cir. 1989); *Unites States v. Aldaz*, 921 F.2d 227, 230 (9th Cir. 1990); *United States v. Ganser*, 315 F.3d 839, 843-44 (7th Cir. 2003).

[16] 280 F.3d 923, 928-29 (9th Cir. 2002).

[17] *Id.*

and the court observed that the delays were beyond the control of the investigating officer.[18]

In the instant case, Beard focuses on Gordon's decision to reroute the package from Hammond back to Houston. He asserts that the decision was unreasonable because a canine sniff "was readily available" in Louisiana. He argues that by choosing not to conduct the canine sniff in Louisiana, Gordon failed to diligently pursue his investigation and that the delay between the seizure of the package and the "maturation of . . . probable cause" would have been substantially minimized.

We disagree that Gordon's decision to reroute the package back to Houston was unreasonable or showed any lack of diligence. Gordon testified that when packages were rerouted back to him in Houston, they were typically mailed back by Express Mail. He expected that the box would reach him "within a day or two." He further testified that he would have encountered delays had he requested a canine sniff be performed in Hammond because he would have had to enlist "people from New Orleans, or wherever it may be, to go to Hammond, get the box, get up to speed, and get a dog hit on it." Gordon further explained that a different postal agent and different AUSA would have to become involved if the dog had alerted in Hammond. Gordon believed "it was six one way, half-a-dozen the other," so they decided to have the package mailed back to Houston where a warrant could be obtained within a day.

In other words, Gordon believed that the time it would take to obtain a warrant in Hammond versus Houston would have been about the same, and because the drugs would ultimately have to be tested in Houston, he chose to request that the package be rerouted to him in Houston. Although the transit

---

[18] *Id.*

time from Hammond to Houston was five days, the delay was beyond Gordon's control. When the package did arrive in Houston, Gordon acted on it quickly and obtained a warrant within 48 hours. Based on the foregoing, we agree with the district court that Gordon's choice to reroute the package back to Houston was reasonable and prudent under the facts of this case. We further agree that the five days the package was in transit from Hammond back to Houston, as well as the two days it took to obtain the warrant after the package returned to Houston, were not unreasonably long under the circumstances.

Relying on an Illinois Supreme Court case, *People v. Shapiro*,[19] Beard also argues that it was not just the delay that made the seizure of the package unreasonable, but also the package's rerouting "400 miles from its intended destination." We find that case distinguishable. In *Shapiro*, a package was sent from Eugene, Oregon, to Champaign, Illinois.[20] Postal Service officials identified the package as suspicious at O'Hare International Airport in Chicago, but instead of investigating the package further there, they pulled it from the mail stream and shipped it to USPIS in St. Louis, Missouri.[21] The "internal policies" of the Postal Service apparently required that the package be shipped out of state to St. Louis, which was neither the sender's nor the recipient's address location, for further investigation.[22] Although there was reasonable suspicion to detain the package at O'Hare and pull it from the mail stream based on drug package profiling characteristics, the court held that the Government did not "expeditiously conduct" its investigation when it

---

[19] 687 N.E.2d 65 (Ill. 1997).

[20] *Id.* at 68.

[21] *Id.*

[22] *Id.* at 70.

shipped the package to St. Louis, "far afield from either O'Hare or the package's intended destination."[23] The court found that had the investigatory steps been taken in Chicago, then the "five-day delivery delay caused in part by rerouting the package to St. Louis" would have been substantially reduced.[24]

In the instant case, the package had extensive connections to Houston: it was mailed from a post office there, the sender (Beard) used the Houston post office frequently, and the investigation of Beard's drug-trafficking activity was being conducted by Gordon in Houston. Moreover, Gordon requested that the package be rerouted to Houston because he believed that there was no difference in the time it would take to obtain a warrant in Houston versus Hammond. Therefore, Beard's reliance on *Shapiro* is misplaced.

## III.

Based on the foregoing, the district court did not err in denying Beard's motion to suppress, and we AFFIRM his conviction and sentence.

---

[23] *Id.*

[24] *Id.* at 71.